80 A.3d 1073

**In the Matter of 2012 LEGISLATIVE DISTRICTING of the State.**

**Misc. Nos. 1, 2, 3 and 5, Sept. Term, 2012.**

Court of Appeals of Maryland.

Dec. 10, 2013.

122

124

Christopher Eric Bouchat, Woodbine, MD, for Appellant in Misc. No. 2.

Jonathan S. Shurberg, Silver Spring, MD, for Appellant in Misc. No. 3. Jason Torchinsky (Shawn Sheehy of Holtzmann, Vogel, Josefiak PLLC, Warrenton, VA; C. Paul Smith, Frederick, MD) for Appellants in Misc. No. 5.

Dan Friedman, Asst. Atty. Gen., Legislative Services Building, Annapolis, MD (Douglas F. Gansler, Attorney General of Maryland, Baltimore, MD and Kathryn M. Rowe and Sandra Benson Brantley, Assistant Attorneys General, Legislative Services Building, Annapolis, MD; Steven M. Sullivan, Matthew J. Fader, and Amanda S. Conn, Assistant Attorneys General, Baltimore, MD), for Appellee.

Argued before BARBERA, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, McDONALD and

BELL,* JJ.

BELL, C.J., (Retired).

The right to formal political representation is fundamental to our state and national democracies. In the second year following each Federal decennial census, the Maryland Constitution provides that the Governor and State Legislature shall reapportion the State's legislative representation consistent with the State's current demographics. To protect the Federal and State legal rights that may be affected by this process, the Maryland Constitution also provides that the citizens of Maryland have the right to challenge this legislative apportionment scheme in this Court. In the present case, we are called upon to consider the validity of Maryland's most recently enacted legislative apportionment plan against three such challenges.

## I.

### A.

Once every ten years, following each United States Census, Article III, § 5 of the Maryland Constitution [1] requires that

---

* Bell, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Article III, § 5 of the Maryland Constitution provides:

"Following each decennial census of the United States and after public hearings, the Governor shall prepare a plan setting forth the boundaries of the legislative districts for electing of the members of the Senate and the House of Delegates.

"The Governor shall present the plan to the President of the Senate and Speaker of the House of Delegates who shall introduce the Governor's plan as a joint resolution to the General Assembly, not later than the first day of its regular session in the second year following every census, and the Governor may call a special session for the presentation of his plan prior to the regular session. The plan shall conform to Sections 2, 3, and 4 of this Article. Following each decennial census the General Assembly may by joint resolution adopt a plan setting forth the boundaries of the legislative districts for the election of members of the Senate and the House of Delegates, which

the State's 47 Legislative Districts (also referred to as "Senate Districts") be reapportioned. Under this provision, the Governor's mandate is to formulate a new legislative apportionment plan in conformance with the requirements of Article III, §§ 2,[2] 3,[3] and 4[4]. Once the legislative apportionment plan is drafted, the Governor must submit the plan to both the President of the Senate and the Speaker of the House of Delegates, who then must introduce the Governor's plan as a Joint Resolution by the first day of the Legislature's regular session in the second year following the decennial United States census. Unless the General Assembly adopts an alter-

---

plan shall conform to Sections 2, 3 and 4 of this Article. If a plan has been adopted by the General Assembly by the 45th day after the opening of the regular session of the General Assembly in the second year following every census, the plan adopted by the General Assembly shall become law. If no plan has been adopted by the General Assembly for these purposes by the 45th day after the opening of the regular session of the General Assembly in the second year following every census, the Governor's plan presented to the General Assembly shall become law.

"Upon petition of any registered voter, the Court of Appeals shall have original jurisdiction to review the legislative districting of the State and may grant appropriate relief, if it finds that the districting of the State is not consistent with requirements of either the Constitution of the United States of America, or the Constitution of Maryland."

2. Section 2 provides:
"The membership of the Senate shall consist of forty-seven (47) Senators. The membership of the House of Delegates shall consist of one hundred forty-one (141) Delegates."

3. Section 3 provides:
"The State shall be divided by law into legislative districts for the election of members of the Senate and the House of Delegates. Each legislative district shall contain one (1) Senator and three (3) Delegates. Nothing herein shall prohibit the subdivision of any one or more of the legislative districts for the purpose of electing members of the House of Delegates into three (3) single-member delegate districts or one (1) single-member delegate district and one (1) multi-member delegate district."

4. Section 4 provides:
"Each legislative district shall consist of adjoining territory, be compact in form, and of substantially equal population. Due regard shall be given to natural boundaries and the boundaries of political subdivisions."

native legislative apportionment plan by the forty-fifth day of that legislative session, the Governor's plan becomes law.

This Court has original jurisdiction to consider any challenges to the legal validity of the legislative apportionment plan. Md. Const. Art. III, § 5. If the Enacted Plan fails legal scrutiny under the Maryland Constitution, the United States Constitution, or other controlling law, this Court shall deem the plan invalid and provide appropriate relief. *Id.*

In March 2011, following the receipt of the 2010 census data for Maryland, the Governor convened a five member committee, the Governor's Redistricting Advisory Committee ("GRAC"), to draft and recommend, after holding public hearings and accepting public comment, a plan for the redistricting of the State's Congressional and Legislative Districts.[5] The GRAC held 12 public hearings during the summer of 2011 and, on December 16, 2011, published its plan for the apportionment of the State's 47 Legislative Districts.

Following receipt of the GRAC committee's recommendations, the Governor presented a legislative apportionment plan to the Senate President and House Speaker, who introduced it in their respective Houses as Senate Joint Resolution 1 and House Joint Resolution 1. The Governor's plan became law on February 24, 2012 as revisions to Maryland Code (1984, 2004 Repl. Vol.) §§ 2–201 and 2–202 of the State Government Article.

The Attorney General, in anticipation of challenges being filed to the newly enacted plan, on March 2, 2012, filed a motion requesting this Court to issue an order promulgating the procedures to be followed in filing and considering any such challenges to the enacted legislative apportionment plan. On March 6, 2012, in response to the Attorney General's

---

5. The GRAC committee included Jeanne D. Hitchcock, Esq., the Governor's Appointments Secretary, as Chair; Thomas V. Mike Miller, Jr., President of the Maryland Senate; Michael E. Busch, Speaker of the Maryland House of Delegates; James King, a former member of the House of Delegates from Anne Arundel County; and Richard Stewart, Chief Executive Officer of Montgomery Mechanical Services.

motion, we issued an order prescribing the schedule for filing challenges: any registered voter of the State who sought to challenge the Enacted Plan had to file a petition with the Clerk of the Court of Appeals no later than May 1, 2012, and the State's response and any *amicus curiae* briefs had to be filed no later than May 31, 2012. The order also appointed retired Court of Appeals Judge Alan M. Wilner as the Court's Special Master to conduct any required hearings.

The following petitions, among others,[6] challenging the Enacted Plan were filed:

1. Petition of Delores Kelley and James Bochin;
2. Petition of Christopher Eric Bouchat;
3. Petition of Cynthia Houser, *et al.*

On September 5, 2012, the Special Master held a hearing in accordance with the procedures promulgated by this Court. At the hearing, expert reports and other evidence were admitted without objection. After the hearing, the Special Master issued his recommendation that the enacted legislative apportionment plan be upheld against each of the challenges. Each party filed exceptions, as to which this Court held oral argument. Following oral argument, we issued the following order:

> WHEREAS, pursuant to the provisions of Sec. 5 of Article III of the Constitution of Maryland, the Governor's legislative districting plan, introduced as House Joint Resolution No. 1 and Senate Joint Resolution No. 1, became effective on February 24, 2012, and

> WHEREAS, the Office of the Attorney General having filed a motion to promulgate procedures to govern any petitions brought under Article III, Sec. 5 of the Constitution of Maryland, and

---

**6.** The Petition of Douglass Howard, filed timely on May 1, 2012, was dismissed, on motion, on June 19, 2012. On July 11, 2012, Robert LePin and Sarah Few filed a petition challenging Legislative District 44. On August 17, 2012, the Court entered an Order dismissing the LePin and Few petitions as untimely.

WHEREAS, challenges to the validity of the legislative districting plan having been filed and an evidentiary hearing having been held before a Special Master appointed by this Court, and

WHEREAS, oral arguments on the challenging petitions and exceptions to the report of the Special Master having been held before this Court on November 7, 2012, and

WHEREAS, the Court having determined that the Governor's plan is consistent with the requirements of the Constitution of the United States and the Constitution of Maryland, it is this 9th day of November, 2012,

ORDERED, for reasons to be stated later in a written opinion, that the relief sought by Petitioners in these actions is denied.

*In the Matter of 2012 Legislative Districting of the State,* 429 Md. 301, 55 A.3d 713 (2012).

We now provide a *de novo* review of the Special Master's legal conclusions, and our reasons in support of the preceding order.

## B.

We begin with a review of the applicable law common to each challenge, and the factual context in which the petitioners' challenges reached this Court.

Federal constitutional restraints on State legislative apportionment arise principally from the Fourteenth Amendment Equal Protection Clause in the so-called "one person, one vote" doctrine enunciated in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and further iterated by this Court in its redistricting jurisprudence: *In re Legislative Districting of State,* 370 Md. 312, 805 A.2d 292 (2002); *Legislative Redistricting Cases,* 331 Md. 574, 629 A.2d 646 (1993); *In re Legislative Districting,* 299 Md. 658, 475 A.2d 428 (1984); *In re Legislative Districting,* 271 Md. 320, 317 A.2d 477 (1974). Under this rule, Maryland Senate Districts, single-member Delegate Subdistricts, and two-member Dele-

gate Subdistricts must be approximately equal to one another in population. *See In re Legislative Districting of State*, 370 Md. 312, 356, 805 A.2d 292, 318; *see also Reynolds*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506; *Maryland Committee for Fair Representation v. Tawes*, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964). This requirement generally is considered to be *prima facie* satisfied if the variation in population between any two legislative districts does not exceed 10%. *See In re Legislative Districting of State*, 370 Md. 312, 356, 805 A.2d 292, 318; *In re Legislative Redistricting Cases*, 331 Md. at 592–594, 629 A.2d at 655–56.

Article III, §§ 2 and 3 of the Maryland Constitution divide the State's population into 47 Legislative Districts (also referred to as "Senate Districts").[7] Based on the 2010 census, Maryland had an adjusted population of 5,772,231 residents.[8] Therefore, based on the adjusted population size, equal apportionment among Maryland's 47 legislative districts translates to 122,813 residents per an ideal Legislative District; 40,938 residents per an ideal equally apportioned single-member Delegate Subdistrict; and 81,875 per an ideal equally apportioned two-member Delegate Subdistrict.

■ Beyond the "one person, one vote" principle, intentional and invidious ethnic discrimination in legislative apportionment is repugnant to the United States Constitution under both the Fifteenth Amendment and the Equal Protection Clause of the Fourteenth Amendment. *See Shaw v. Reno*, 509

---

7. From each Legislative District there is to be elected one Senator to the Maryland State Senate and three Delegates to the Maryland House of Delegates. Each Legislative District may be subdivided into three Delegate Subdistricts, from each of which one Delegate is to be elected. Legislative Districts may also be divided into two Delegate Subdistricts, from one of which two Delegates are to be elected and from one of which one Delegate is to be elected.

8. Although census data showed 5,773,552 actual residents, in formulating a legislative apportionment scheme, Maryland does not include incarcerated individuals, who were not residents of Maryland prior to their incarceration. See Maryland Code (1957, 2011 Repl. Vol., 2012 Supp.), Art. 24, § 1–111.

U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). Legislative apportionment plans that effectively disenfranchise or abridge the right to vote of any citizen on account of "race or color" are prohibited by § 2 of the Voting Rights Act of 1965 (42 U.S.C. § 1973).[9]

With respect to Maryland law, the provisions that govern the legislative redistricting process were adopted by the Maryland voters in 1970, *see* Ch. 785 of the Acts of 1970, and 1972; Ch. 363 of the Acts of 1972, when the State Constitution was amended.[10] In addition to the drafting procedures noted

---

**9.** 42 U.S.C. § 1973 provides in pertinent part:

"(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in Section 1973b (f)(2) of this title, as provided in subsection (b) of this section.

"(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."

**10.** Four redistricting plans have been adopted since the adoption of the 1970 and 1972 amendments, and each of the plans has been challenged in this Court. In 1974, *see In re Legislative Districting,* 271 Md. 320, 317 A.2d 477 (1974), this Court deemed the Governor's plan and the subsequent elections conducted pursuant to it, unconstitutional due to a procedural violation in the adoption of the plan. We then used the Governor's plan as a guide and developed our own legislative apportionment plan as a corrective measure. We found the 1982 plan to contain no legal violations despite several challenges. *In re Legislative Districting,* 299 Md. 658, 665, 475 A.2d 428, 431 (1984). We approved the 1992 plan, but noted that it approached "perilously close" to violating Article III, § 4's due regard requirement. *Legislative Redistricting Cases,* 331 Md. 574, 614, 629 A.2d 646, 666 (1993). In 2002, we found that the Enacted Plan contained an impermissible number of border crossings, in violation of Article, III § 4's due regard require-

above, Article III, § 4 provides: "Each legislative district shall consist of adjoining territory, be compact in form, and of substantially equal population. Due regard shall be given to natural boundaries and the boundaries of political subdivisions." Thus, Article, III § 4 of the Maryland Constitution requires that "[e]ach legislative district shall consist of adjoining territory, be compact in form, and of substantially equal population" and that "[d]ue regard shall be given to natural boundaries and the boundaries of political subdivisions." [11] We have held that an excessive number of border crossings violates Article, III § 4's due regard requirement, and have described adherence to this provision, along with the applicable Federal law, as "the essential prerequisite of any redistributing plan." *In re Legislative Districting of State*, 370 Md. at 321, 805 A.2d at 297. Non-compliance with this requirement is only permissible when it conflicts with a superseding Federal law, or a more important State constitutional requirement. *Id.* at 353–54, 805 A.2d at 316.

We have further explained that:

"This is not to say that, in preparing the redistricting plans, the political branches, the Governor and General Assembly, may consider only the stated constitutional factors. On the contrary, because, in their hands, the process is in part a political one, they may consider countless other factors, including broad political and narrow partisan ones, and they may pursue a wide range of objectives. Thus, so long as the plan does not contravene the constitutional criteria, that it may have been formulated in an attempt to preserve communities of interest, to promote regionalism, to help or injure incumbents or political parties, or to achieve other social or political objectives, will not affect its validity.

---

ment. *In re Legislative Districting of State,* 370 Md. 312, 805 A.2d 292 (2002). In response, we drafted our own legislative apportionment plan because there was insufficient time for the political branches to redraw the Legislative Districts prior to the then pending election. *Id.* at 323, 805 A.2d at 298.

11. Cities and counties constitute political subdivisions for purposes of Article III, § 4 of the Maryland Constitution.

"On the other hand, notwithstanding that there is necessary flexibility in how the constitutional criteria are applied—the districts need not be exactly equal in population or perfectly compact and they are not absolutely prohibited from crossing natural or political subdivision boundaries, since they must do so if necessary for population parity—those nonconstitutional criteria cannot override the constitutional ones. We made this clear in both our 1984 and 1993 decisions. Specifically, we acknowledged the importance of natural and subdivision boundaries and rejected the argument that such things as the promotion of regionalism and the protection of nonofficial communities of interest could overcome that requirement. The Legislature apparently understood and acquiesced in that ruling, as no attempt was made in the intervening decades to amend the Constitution and, thereby, include those or any other factors in the constitutional framework."

*In re Legislative Districting of State*, 370 Md. at 321–22, 805 A.2d at 297. Thus, despite the aforementioned restrictions, we have recognized that the political branches, the Governor and General Assembly, are given a wide-berth in formulating a legislative apportionment scheme. So long as the plan they devise does not violate State or Federal law, the political branches may pursue a wide variety of objectives, including preserving community interests, promoting of regionalism, and aiding political allies or injuring political rivals. *Id.*

Because Article III, § 4 of Maryland Constitution was only ratified in 1972 and the Legislature only reapportions itself once every ten years, this Court has only on four prior occasions considered the constitutional propriety of a legislative apportionment plan under the requirements of Article III, § 4—*In re Legislative Districting of State*, 370 Md. 312, 805 A.2d 292 (2002); *Legislative Redistricting Cases*, 331 Md. 574, 629 A.2d 646 (1993); *In re Legislative Districting*, 299 Md. 658, 475 A.2d 428 (1984); *In re Legislative Districting*, 271 Md. 320, 317 A.2d 477 (1974). Only in two of those opinions, *Legislative Redistricting Cases*, 331 Md. 574, 629 A.2d 646 (1993), and *In re Legislative Districting of State*, 370 Md. 312,

805 A.2d 292 (2002), did we provide substantive analysis of the due regard requirement.

Under the 1992 redistricting plan, there were a total of 18 multi-county crossings statewide, five more than existed under the 1982 plan. *See Legislative Redistricting Cases,* 331 Md. at 613–14, 629 A.2d at 666–67. Baltimore County was involved in seven of them, five were shared with Baltimore City, and one each shared with Harford County and Howard County. *See id.* at 613, 629 A.2d at 665. Although the Court sustained the plan against a due regard challenge under Article III, § 4 of the Maryland Constitution, the Court warned that the plan came "perilously close" to violating the due regard requirement because of the relatively high number of border crossings. *Id.* at 614, 629 A.2d at 666.

The 2002 Enacted Plan increased the number of border crossings from 18 to 22. In *In re Legislative Districting of State,* 370 Md. 312, 805 A.2d 292 (2002), we considered the constitutional validity of that plan. We specifically addressed the question of whether a constitutional requirement, such as the Article III, § 4's due regard requirement, could be subordinated to non-constitutionally mandated justifications. *See id.* at 370, 805 A.2d at 326. The State argued that the due regard requirement could be subordinated to such non-constitutional justifications. *See id.* at 366, 805 A.2d at 324. We disagreed, holding that constitutional requirements, such as the due regard requirement, are mandatory requirements. *Id.* at 356, 805 A.2d at 318. As such, the due regard requirement, we said, cannot be subordinated to justifications not mandated by the Federal or State Constitutions. *Id.* at 371–72, 805 A.2d at 327–28. We concluded that the plan contained an excessive number of political subdivision crossings that could not be constitutionally justified. *Id.* at 368, 805 A.2d at 325. We concluded from this that the plan violated Article III, § 4's requirement that "[d]ue regard shall be given to natural boundaries and the boundaries of political subdivisions," and was, therefore, constitutionally deficient. *Id.* at 374, 805 A.2d at 328. Due to the then pending 2002 election, there was insufficient time for the Court to return the plan for

correction to the General Assembly. We therefore created a districting plan in compliance with State and Federal law that paid no deference to the ordinarily permissible political considerations. *Id.* at 323, 805 A.2d at 298.[12]

Our legislative apportionment plan reduced the number of political subdivision crossings from 22 under the Governor's 2002 plan to 14, all of which were required to achieve substantial population equality, and eliminated all multi-county districts between Baltimore County and Baltimore City. Baltimore County, based on the 2000 Census, had an adjusted population of 754,292, five legislative districts entirely within the county, and two shared districts with Carroll, Harford, and Howard Counties, respectively. Baltimore City, which, based on the 2000 Census, had an adjusted population of 651,154, received six legislative districts all entirely inside of its city limits.

In the decade between the 2000 Census and the 2010 Census, the adjusted population of Baltimore City fell from 651,154 to 624,054, while the adjusted population of Baltimore County increased from 754,292 to 807,053. The adjusted population of the State according to the 2010 census, as indicated, was 5,772,231, so that an equal distribution of population across each of the 47 legislative districts, an "ideal" district (a district representing 1/47th of eligible voters) would contain approximately 122,813 people. The population of Baltimore City, at an adjusted population of 624,054, would, therefore, equal and thus justify, roughly 5.1 "ideal" legislative

---

12. The Court explained:

"When the Court drafts the plan, it may not take into account the same political considerations as the Governor and the Legislature. Judges are forbidden to be partisan politicians. Nor can the Court stretch the constitutional criteria in order to give effect to broader political judgments, such as the promotion of regionalism or the preservation of communities of interest. More basic, it is not for the Court to define what a community of interest is and where its boundaries are, and it is not for the Court to determine which regions deserve special consideration and which do not."

*In re Legislative Districting of State,* 370 Md. at 323, 805 A.2d at 298 (2002).

districts. Baltimore County, at an adjusted population of 807,053, would, therefore, equal and thus justify, roughly 6.5 ideal legislative districts. Although Baltimore City's population equals little more than five ideal legislative districts, the 2012 Enacted Plan assigns six legislative districts to Baltimore City. Five of these districts exist entirely within Baltimore City.[13] The remaining legislative district, District 44,[14] crosses into Baltimore County, and is the basis for several of the challenges to the Enacted Plan.[15]

These challengers, as do all challengers to a legislative reapportionment plan, carry the burden of demonstrating the law's invalidity. *See In re Legislative Districting of State*, 370 Md. at 336, 805 A.2d at 306. Once, however, a proper challenge under Article III, § 4 is made and is supported by "compelling evidence," the State has the burden of producing sufficient evidence to show that the districts are contiguous and compact, and that due regard was given to natural and

---

**13.** In the previous plan, District 44 covered the southwestern portion of Baltimore City and did not cross any political subdivision boundary. District 10 sat entirely within Baltimore County and abutted Baltimore City's western border, including District 41. District 42 existed entirely within Baltimore County. It abutted the northern border of Baltimore City, and extended northward about one-third of the way to the Pennsylvania line.

**14.** In addition to reconfiguring District 44 to extend across the Baltimore City and Baltimore County lines, the drafters of the Enacted Plan also split District 44 into two delegate subdistricts, Subdistricts 44A and 44B. The drafters drew Subdistrict 44A entirely within Baltimore City, and Subdistrict 44B entirely within Baltimore County. Most of the territory contained within Subdistrict 44B in the Enacted Plan, constituted part of District 10 under the our 2002 plan. District 10, as a result, no longer shares a contiguous border with Baltimore City, extends to the Carroll County line, and contains a large mixture of ethnic populations. To accommodate the extension of District 44, District 42 was shortened in width and split into two delegate subdistricts. One of the two districts is a single-member Delegate Subdistrict that sits along the northern border of Baltimore City. The other subdistrict contained in District 42 is a two delegate subdistrict, which extends in a northerly direction up to the Pennsylvania state line.

**15.** The Enacted Plan contains 13 total border crossings statewide, one fewer than the 14 contained in the previous plan.

political subdivision boundaries. *Legislative Redistricting Cases*, 331 Md. at 613–14, 629 A.2d at 666.

## II.

■ On April 26, 2012, the petitioner, Christopher Eric Bouchat filed, *pro se*, a "Motion to Declare Maryland General Assembly Joint Resolution No. 1, 2012 Unconstitutional & Hence Null and Void." The Special Master treated that pleading as a timely challenge, under Article III, § 5 of the Maryland Constitution, to the Enacted Plan. In his petition, the petitioner proposed that the bicameral scheme prescribed in the Federal Constitution for the organization of the Legislative Branch of the Federal Government similarly applies to the organizational structure of the legislative branches of the various states. Noting that Article I, §§ 2 and 3 of the U.S. Constitution provides for a House of Representatives, that, subject to each State having at least one Representative, must be apportioned among the States according to population, and a Senate consisting of two Senators from each state, he reasons that the Federal Constitution impliedly requires every state legislature to establish an identical structure. Proceeding on this premise, he argues that multi-member districts or districts that cross county lines are strictly prohibited, that each county in Maryland and Baltimore City must have at least one Delegate in the House of Delegates and that the Maryland Senate must consist of two Senators from each county and Baltimore City. This Court should correct these errors, the petitioner maintains, through its judicial power by:

"(1) declaring Article III, § 3 of Maryland Constitution, which permits Maryland's multi-member House of Delegates, null and void;

"(2) declaring Article III, § 2 of the Maryland Constitution null and void;

"(3) requiring that all delegates be elected from single-member districts;

"(4) prohibiting House of Delegates subdistricts from crossing county lines; and

"(5) requiring that each county be entitled to one Delegate and that all other Delegate seats be apportioned according to population."

In addition to Article I, §§ 2 and 3 of the Federal Constitution, the petitioner relies on selected portions of the Federalist Papers,[16] the Fourteenth Amendment's Privileges and Immunities Clause, the guarantee of Article IV, § 4 of the U.S. Constitution that each State have a republican form of government, Article II, § 1 of the U.S. Constitution,[17] and the Ninth and Tenth Amendments to that Constitution.

Responding to the State's motion that the petition be dismissed without evidentiary hearing as failing to state a cognizable claim, as a matter of law, the Special Master, noting that this Court had not acted to dismiss the petition and that the petitioner participated in the evidentiary hearing, concluded that the Bouchat petition would be determined upon its merits. The Special Master then proceeded to address those merits. His reasoning and recommendation are as follows:

*"Analysis and Recommendation*

"Mr. Bouchat's first argument, that the structure of Congress directed in Article I, §§ 2 and 3 of the U.S. Constitution is a required template for the States, is without merit. The text of those provisions, by their clear wording, apply only to the structure of Congress and do not purport in any way to control the structure of State legislatures, much less to require a State legislative apportionment that would produce significant population disparities or to require single-member districts that do not cross county lines. Apart

---

**16.** The petitioner cites The Federalist Papers No. 23: Hamilton, No. 39: Madison, No. 44: Madison, No. 46: Madison, No. 47: Madison, No. 51: Madison, No. 62: Madison, and No. 63: Madison.

**17.** U.S. Const. art. II, § 1, cl. 2:

"Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector."

from the lack of any such textual requirement, the Supreme Court, in *Reynolds v. Sims, supra,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 expressly rejected 'the applicability of the so-called federal analogy to state legislative apportionment arrangements,' holding that 'the Founding Fathers clearly had no intention of establishing a pattern or model for the apportionment of seats in state legislatures when the system of representation in the Federal Congress was adopted.' *Id.* at 572–73, 84 S.Ct. At [at] 1387, 12 L.Ed.2d at 534–35.

"Nor does the guaranty of a republican form of government in Article IV, § 4 of the U.S. Constitution create a Federal Constitutional basis for judicial relief. *See Baker v. Carr,* 369 U.S. 186, 218–24, 82 S.Ct. 691, 710–13, 7 L.Ed.2d 663, 686–89 (1962), where the Supreme Court flatly rejected Article IV, § 4 as a basis for judicial review of a State's legislative apportionment plan. *See also New York v. United States,* 505 U.S. 144, 184, 112 S.Ct. 2408, 2432, 120 L.Ed.2d 120, 155 (1992).

"The Federal Constitution constraints on State legislative districting are those arising from the Equal Protection Clause of the Fourteenth Amendment, the principal one being the 'one person/one vote' requirement announced in *Reynolds v. Sims,* under which, as this Court iterated in *Matter of Legislative Districting, supra,* 370 Md. at 325, 805 A.2d at 299, "the states are required to apportion *both* houses of their legislatures on an equal population basis, to assure that one citizen's vote is approximately equal in weight to that of every other citizen." (Emphasis added). "In light of the State's current demographic distribution, the supervening Constitutional requirement of substantially equal population in both Senate Districts and Delegate Subdistricts absolutely precludes any apportionment scheme under which each county would be entitled to two (or any other equal number of) Senators. Under such a scheme, Kent County, with an adjusted population of 20,266, and Montgomery County, with an adjusted population of 972,-338, would each be entitled to two Senators, giving each

resident in Kent County 48 times the voting strength of a resident in Montgomery County. A similar scheme was expressly rejected in *Reynolds v. Sims*, and as well in the companion case of *Maryland Committee for Fair Representation v. Tawes*, *supra*, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595.

"Unless the size of the House of Delegates were to be expanded five to tenfold, any requirement that each county be entitled to one Delegate would be doomed for the same reason. *See Maryland Committee*, *supra*. As Article III, §§ 2 and 3 of the Maryland Constitution provide for 141 members of the House of Delegates, to be elected from 47 Legislative Districts, three from each district, and as there is no Federal Constitutional impediment to that provision, the apportionment of the House of Delegates on any basis other than substantial equality of population is impermissible.

"Finally, in his petition, Mr. Bouchat contends that multi-member Delegate districts are prohibited under Federal Constitutional law and that, to the extent they may be permitted, they may not cross county lines. Multimember districts, he avers, 'institute voting inequality upon the populous,' and combining parts of two or more counties in a single district 'caus[es] a minority county section to be disenfranchised by the majority county portion of the district.' He offers no facts to show that any particular multimember or multi-county district has produced that effect, however, other than noting generally that since the Civil War, with limited exceptions, the Democratic Party has controlled the House of Delegates.

"The Supreme Court, on a number of occasions, has expressed concern over certain undesirable features of multi-member districts, especially as they may dilute the ability of racial or ethnic minorities in such districts to elect members of their group to legislative office. So far, however, the Court has made clear that such a district is not *per se* unlawful under the Equal Protection Clause. The clearest expression of the Court's view is in *Whitcomb v. Chavis*, 403

U.S. 124, 142–43, 91 S.Ct. 1858, 1868–69, 29 L.Ed.2d 363, 375–76 (1971):

'In *Lucas v. Colorado General Assembly*, 377 U.S. 713 [84 S.Ct. 1459, 12 L.Ed.2d 632] (1964), decided with *Reynolds v. Sims*, we noted certain undesirable features of the multi-member district but expressly withheld any intimation 'that apportionment schemes which provide for the at-large election of a number of legislators from a county, or any political subdivision, are constitutionally defective.' 377 U.S. at 731, n. 21 [84 S.Ct. 1459, 12 L.Ed.2d 632]. Subsequently, when the validity of the multi-member district, as such, was squarely presented, we held that such a district is not *per se* illegal under the Equal Protection Clause. [citations omitted]. That voters in multi-member districts vote for and are represented by more legislators than voters in single-member districts has so far not demonstrated an invidious discrimination against the latter. But we have deemed the validity of multi-member district system justiciable, recognizing also that they may be subject to challenge where the circumstances of a particular case may 'operate to minimize or cancel out the voting strength of racial or political elements of the voting population.[']

'[W]e have insisted that the challenger carry the burden of proving that multi-member districts unconstitutionally operate to dilute or cancel the voting strength of racial or political elements.'

"*See also Thornburg v. Gingles*, 478 U.S. 30, 48, 106 S.Ct. 2752, 2765, 92 L.Ed.2d 25, 45 (1986); *In re Legislative Redistricting [Districting ], supra*, 299 Md. at 673, 475 A.2d at 435; *Legislative Redistricting Cases, supra*, 331 Md. at 606, 629 A.2d at 662.

"The additional references in Mr. Bouchat's pre-hearing memorandum to Article I, § 1 of the Federal Constitution (the method of electing the President) and the Ninth and Tenth Amendments are to no avail. He does not explain how the Enacted Plan violates any of the provisions, and none are apparent.

"As Mr. Bouchat, who has the burden of production and persuasion on this issue, has failed to show that any multi-member district provided for in the Enacted Plan would have the effect of diluting or canceling the voting strength of any racial or political element, he has failed to make a case for declaring any such district unlawful. With respect to the complaint about a multi-member district including parts of more than one county, there is no Federal prohibition against such a district, but is more a matter of compliance with the requirement in Article III, § 4 of the Maryland Constitution that, in the creation of any district or subdistrict, due regard be given to natural and political boundaries. As the Court has made clear, however, if a multi-county district or subdistrict is created in order to gratify some supervening requirements—equivalent population, compliance with the Voting Rights Act—then the 'due regard' requirement may be regarded as either yielding or complied with. It is 'the most fluid of the constitutional component outlined § 4.' *In re Legislative Districting, supra,* 299 Md. at 681, 475 A.2d at 439.

"**For these reasons, it is recommended that Mr. Bouchat's petition be denied.**"

(Footnotes omitted) (emphasis in original).

The petitioner excepts to the recommendation of the Special Master, arguing that the "one person, one vote" doctrine exists in violation of rights granted under the Fourteenth Amendment and Article IV, § 4 of the United States Constitution. In support of his exception he notes that our government is a democratically elected federalist republic, which protects the voting rights of citizens who live in less populated political sub-divisions through the Electoral College and the balance of representation in the U.S. Senate. Without clear or detailed explication, he argues that, under the Fourteenth Amendment, "voting rights" must be uniform whether in the federal or state system. In addition to his general exception to the Special Master's recommendation, the petitioner specifically argues that the Special Master failed to address adequately the purported impropriety of having multi-member

districts with varying numbers of Delegates. He argues, again without clear explication, that this apportionment structure violates every premise of the "one person, one vote" principle and, in addition, offends the Fourteenth Amendment and Article IV, § 4 of the United States Constitution.

We conclude that the petitioner has not met the required burden to properly challenge the Enacted Plan. The petitioner's challenge is not supported, as required under Article III, § 4, by "compelling evidence," "demonstrat[ing] that the plan has subordinated mandatory constitutional requirements to substantial improper alternative considerations." *Matter of Legislative Districting*, 370 Md. at 373, 805 A.2d at 328. Accordingly, the petitioner's exceptions to the Special Master's findings and recommendations are without merit and we, therefore, adopt the Special Master's recommendation to deny the Bouchat petition.

### III.

#### A.

The petitioners, Delores Kelley and James Brochin, are registered voters and incumbent members of the Maryland Senate from Baltimore County.[18] They claim that the Enacted Plan violates Article III, § 4's requirement that "[d]ue regard shall be given to natural boundaries and the boundaries of political subdivisions" (also referred to as the "due regard requirement"). This is so, they contend, because the Enacted Plan contains a border crossing between political subdivisions, Baltimore City and Baltimore County, not required by law and allegedly constructed for the purpose of retaining six state senators in Baltimore City.

The petitioners alleged in their petition that the reconfiguration of Legislative Districts 10, 42, and 44 in the Enacted Plan violates the due regard requirement of Article III, § 4 of

---

18. Senator Kelley represented District 10 as it existed under the 2002 Plan and Senator Brochin represented District 42 as it existed under the 2002 Plan.

the Maryland Constitution. They argued that, because the population of Baltimore City justifies no more than five Legislative Districts, while the population of Baltimore County entitles it to at least six Legislative Districts, neither the border crossing nor the extension of District 44 into Baltimore County was necessary to accomplish either population equality or voting rights protection for any racial or ethnic minority. For this reason, the petitioners further argued, the effect of the border crossing and extension is to underpopulate the Baltimore City Districts, in order to make it possible that Baltimore City will be able to elect six Senators, rather than five. The petitioners' request is that this Court hold that the provisions of the Enacted Plan, relating to Baltimore City and Baltimore County, violate the due regard requirement of Article III, § 4, and that this Court create a new map that removes the subdivision crossing between Baltimore City and Baltimore County.

The State responded to the petitioners' challenge with a motion to dismiss and, in the alternative, for favorable summary disposition. It argued, in support of its dispositive motions, that a single crossing between one county into another, such as the one between Baltimore City and Baltimore County in the Enacted Plan, cannot alone determine whether the Enacted Plan satisfies the due regard requirement. The State asserted, furthermore, that this Court has never determined the legal validity of a reapportionment scheme on the basis of a single border crossing. Instead, the State said this Court's due regard jurisprudence considers the constitutional validity of a reapportionment plan "holistically," meaning on a statewide basis. Proceeding on this premise, noting, in that regard, that the petitioners only challenged the validity of the Enacted Plan in one portion of the State, it contended that the petitioners failed to make a valid legal challenge. The State also observed that, because the Enacted Plan contained fewer border crossings, statewide, than earlier legally valid apportionment plans, there cannot exist a violation of the due regard requirement in the present plan.

With respect to the merits of the petitioners' challenge, the State relies on the fact that an additional border crossing was necessary in order for Baltimore County's citizens to realize the full extent of their franchise. Thus, it reasoned and argued, that the decision as to where to locate the necessary border crossing is a political choice vested in the political branches, and not in the judiciary.

The Special Master agreed with the petitioners, that the population of Baltimore City entitled it to five Senate Districts, and that all of these Districts could be located within the City's boundary. He observed, however that, achieving that result, would require a reconfiguration of the Legislative Districts in Baltimore City, Baltimore County, and at least one of the counties neighboring Baltimore County.

On review of our precedents concerning the due regard requirement, the Special Master rejected the State's "holistic" approach, finding it to be without legal support, that there is nothing in this Court's prior decisions from which the State's assertion, one unjustified border crossing should be disregarded solely because there are fewer total border crossings in the present plan than in an earlier plan that survived constitutional scrutiny, can be justified. In support of his view, the Special Master noted that, in the 2002 decision, this Court discussed each petition and county crossing individually, and found violations on an individual district-by-district basis. *See Matter of Legislative Districting*, 370 Md. at 364–65, 805 A.2d at 323. Thus, the Special Master, concluding that the critical question at issue in a due regard inquiry is whether a challenged border crossing can be justified as necessary to accomplish a superseding, or equally significant, constitutional requirement, reasoned, "upon the presentation of compelling evidence tending to indicate an unnecessary incursion, the State has the burden of demonstrating compliance with the due regard requirement with respect to that incursion." No such presentation of compelling evidence was presented in this case, he maintained, however.

The Special Master also concluded that the State correctly argued that the decision as to where constitutionally required border crossings should be located is a political one, to which this Court should defer. He explained that the crossing of the boundary was necessary, and without the established proof of evidence of impermissible racial or political discrimination, the choice of where that crossing was to be made was, indeed, political, and appropriately reserved for the Governor and the General Assembly. For this reason, as well the Special Master recommended that the petitioners' challenge be denied.

In response to the Special Master's recommendation, the petitioners filed exceptions to the conclusions drawn by the Special Master: that the subdivision crossing between the Baltimore City and Baltimore County line was "necessary," constitutionally justified pursuant to this Court's opinion in *In re Legislative Districting of State*, 370 Md. 312, 805 A.2d 292 (2002), and that, assuming the crossing was justified, the choice of where that crossing occurs is a wholly political consideration to which this Court must defer. The petitioners argue that the Special Master's conclusions are contrary to this Court's 2002 decision and analysis, which point out the distinction between constitutional and non-constitutional considerations. They emphasize our holding in that case that due regard requirements cannot be subordinated to non-constitutional justifications. *See id.* at 371, 805 A.2d at 327. Accordingly, the petitioners maintain that, because the Enacted Plan's drafters did not have a constitutional justification for creating a sixth legislative district in Baltimore City and a border crossing between Baltimore County and Baltimore City, other than to retain six (6) Senators in Baltimore City, the Enacted Plan violates Article III, § 4's due regard requirement.

The State also excepted to the Special Master's recommendation relevant to the Kelly/Brochin petition.[19] Although it

---

19. The state moved for summary judgment as to each of the petitions. The Special Master opined, as a preliminary matter, that, notwithstand-

agrees with the Special Master that the petitioners' arguments lack merit, the State takes exception to the rationale the Special Master offers to support his conclusion. That reasoning is, as it sees it, a departure from Maryland precedent governing the burden of proof in legislative apportionment cases. It maintains, as it did in its dispositive motion, that a single border crossing cannot be the basis for an Article III, § 4 challenge; only an excessive total number of political subdivision crossings statewide would suffice as the basis for a challenge arising under that section's due regard requirement. For reasons discussed below, we also conclude, as the Special Master did, that petitioners' arguments are without merit, but also decline to adopt the reasoning offered by the State.

### B.

The State's argument requires an analysis of the nature of the due regard requirement and, if accepted, will preclude all substantive challenges to it except those whose reach is statewide. Thus, we shall first consider whether the due regard inquiry is limited in its scope to only the total number of political subdivision crossings statewide, before reaching the issue of whether the Enacted Plan satisfies Article III, § 4's due regard requirement.

The State's position is that the petitioners have failed to state a claim, or present a meritorious argument, under Article III, § 4's due regard requirement. It believes that a single border crossing, contained in a legislative districting

---

ing this Court's order "that ruling on said motions shall be deferred until oral argument before this Court in November 2012," this Court has "effectively denied" the State's dispositive motions. The State argues in support of its dispositive motions that the material facts in this case, such as the boundaries of the districts in the Enacted Plan, the population information from the Census Bureau, and election-related information from the State Board of Elections, are essentially undisputed legislative facts that are matters of public record so that there is no dispute of material fact, entitling it to judgment as a matter of law. *See O'Connor v. Baltimore County,* 382 Md. 102, 111, 854 A.2d 1191, 1197 (2004). We do not reach this issue, preferring to address the merits.

plan, cannot be dispositive of the question of whether that districting plan satisfies the due regard mandate. The State relies on our cases, *Legislative Redistricting Cases*, 331 Md. 574, 629 A.2d 646 (1993), and *In re Legislative Districting of State*, 370 Md. 312, 805 A.2d 292 (2002), for support, arguing that each of these cases tested the validity of an apportionment scheme under the due regard provisions using an holistic approach. Because, according to the State, the disposition of those cases depended primarily upon the total number of border crossings statewide, a challenge may not be brought properly under the due regard provision for border crossings located only within a particular region of the State, or where a plan contains fewer total statewide border crossings than the number of crossings contained in an earlier constitutionally valid enacted plan. To the State, this holistic approach implies that the due regard inquiry is a numerical inquiry, strictly concerned with the statewide *total* number of political subdivision crossings in the plan under review, as compared to past plans. The State points out that the Enacted Plan has one fewer total statewide border crossings than the previous plan, promulgated by the Court, and that the petitioners' challenge pertains only to the single subdivision crossing between Baltimore County and Baltimore City.

The State further insists that legislative redistricting is a fundamentally political process, as to which the holistic approach it advocates provides clear guidance to the political branches, and prevents judicial encroachment upon the redistricting powers committed by the Maryland Constitution to the political branches. Any alternative conclusion, it maintains, ensures future scrutiny from this Court, effectively perpetually placing the judicial branch inside of what is essentially a political process.

We agree with the State that Article III, § 5 of the Maryland Constitution commits to the political branches, the Governor and State Legislature, the task of formulating a legislative apportionment plan. *See In re Legislative Districting of State*, 370 Md. at 320–21, 805 A.2d at 296–97. Indeed,

we have held that the political branches are the primary actors in Maryland's legislative reapportionment process. *Id.* We also understand that, because of this constitutional commitment, as a matter of the separation of powers, political officials may legally pursue a wide variety of political aims in creating a legislative re-apportionment plan. *See id.* at 321–22, 805 A.2d at 297 (noting permissible political aims, such as the preservation of communities of interest, promotion of regionalism, and helping or injuring incumbents or political parties). We recognize, as the Supreme Court also does, that when political officials create a legislative apportionment design, politics are fundamental to the process and the result. *See id.* at 354, 805 A.2d at 316–17 (citing *Gaffney v. Cummings,* 412 U.S. 735, 753, 93 S.Ct. 2321, 2331, 37 L.Ed.2d 298, 312 (1973)). In our 2002 redistricting opinion, we quoted *Gaffney,* observing that " '[p]olitics and political considerations are inseparable from districting and apportionment.... The reality is that districting inevitably has and is intended to have substantial political consequences.' " *Id.* (quoting *Gaffney,* 412 U.S. at 753, 93 S.Ct. at 2331, 37 L.Ed.2d at 312). Among those consequences, the political branches are accorded, by law, a great degree of discretion to pursue political considerations in formulating a redistricting plan. *In re Legislative Districting,* 299 Md. at 685, 475 A.2d at 442 (explaining that the mere fact that political considerations enter the result or process of legislative reapportionment does not render a legislative redistricting plan unconstitutional).

The political branches, however, do not have the authority to contravene constitutional requirements. See *In re Legislative Districting of State,* 370 Md. at 353–54, 805 A.2d at 316.[20]

---

20. In *In re Legislative Districting of State,* 370 Md. 312, 353–54, 805 A.2d 292, 316 (2002), we held that the "due regard" clause is a mandatory limit on the powers of the Legislature and the Governor in formulating a legislative apportionment plan. There, we explained:

"The Maryland Constitution is the expression of the will of its citizens. That will is binding on all the parties to the redistricting process, including the Governor and the General Assembly. Any change in the constitutional requirements of a districting plan must

Article III, § 5, the very same provision that commits to the political branches its role in devising a legislative apportionment plan, delegates to the judicial branch the power to review the legislative redistricting plan. We explained in *In re Legislative Districting of State*, 370 Md. 312, 805 A.2d 292 (2002), our role in the process:

"Article III, § 5 of the Maryland Constitution expressly entrusts to this Court the responsibility, upon proper petition, to review the constitutionality of districting plans prepared and enacted by the political branches of government and the duty to provide appropriate relief when the plans are determined to violate the United States and Maryland Constitutions or other laws. In other words, it is this Court's duty to enforce adherence to the constitutional requirements and to declare a redistricting plan that does not comply with those standards unconstitutional. Noncompliance with a state constitutional requirement is permitted only when it conflicts with a federal requirement or another more important Maryland constitutional requirement."

*Id.* at 353–54, 805 A.2d at 316. Therefore, if the Legislature enacts a reapportionment plan which fails to meet a State or Federal constitutional requirement, this Court is required by its Constitution to strike down the unconstitutional plan. So, although the process of formulating and enacting a redistricting plan is essentially political, it is the judicial function to uphold the requirements of the United States Constitution and the Maryland Constitution. Violations of the redistricting requirements contained in Article III, § 4 of the Maryland

---

be effected via the process of amending the Constitution. Article III, § 4 is quite clear in setting out the requirements for legislative districts. That being the case, accepting a "rational goal" as a basis for avoiding a clear requirement under that section is to allow a constitutional mandate to be overridden by a non-constitutional one. Indeed, to interpret this constitutional provision as to subjugate it or any of its component constitutional requirements to lesser principles and non-constitutional considerations or factors would be to amend the constitution without the involvement of the most critical players: the State's citizens."
*Id.* at 372–73, 805 A.2d at 328.

Constitution, such as the due regard requirement at issue here, are no exception to this obligation.[21]

■ The State's argument that a valid challenge to the due regard provision must demonstrate that the total number of border crossings statewide is excessive is without merit. A necessary component of this holistic approach is the State's suggestion that, so long as an apportionment plan contains fewer border crossings than an earlier legally valid plan, it is immune from all attacks arising from the due regard requirement. As a result, the legislative districting requirements set out in Article III, § 4 could only be considered on a statewide basis, meaning that constitutional violations are permissible, so long as the effects of those violations are not widely shared by the public. The right to judicial review, however, is not dependent upon a potential constitutional violation being widely shared; the right exists even when the violation is limited to one region of the state, and even when an earlier plan contained more crossings than the plan under review. We have explained that the due regard provision acts to preserve local interests through the "fixed and known features which enable voters to maintain an orientation to their own territorial areas." *In re Legislative Districting*, 299 Md. at 681, 475 A.2d at 439. We have similarly observed that the due regard provision works to preserve local political interests, insofar as it ensures geographically concurrent political representation, and acts as a deterrent to the gerrymandering of legislative districts. *See In re Legislative Redistricting Cases*, 331 Md. at 612, 629 A.2d at 665. As such, the very application of the holistic approach would frustrate the purposes of the due regard requirement by denying a remedy to citizens that are directly affected by a constitutional violation because other citizens, the majority, across the state are unaffected. In addition, this approach would directly contradict our responsi-

---

21. Article III, § 4 of the Maryland Constitution provides that "[e]ach legislative district shall consist of adjoining territory, be compact in form, and of substantially equal population [,]" and that "[d]ue regard shall be given to natural boundaries and the boundaries of political subdivisions."

bility under Article III, § 5 to provide appropriate relief upon a properly made challenge where the Enacted Plan violates the legislative redistricting requirements contained in the Maryland Constitution.

The holistic approach is also incompatible with the notion that each case will be decided upon its own unique facts. This notion is particularly important in the context of legislative apportionment, because the essential purpose of legislative reapportionment is to recalibrate political representation to the constantly shifting demographics of the State. Due to the shifts in population that may occur from decade to decade, what may be a constitutional necessity at the time one plan is enacted may no longer be a constitutional necessity by the time the next plan is enacted. Conversely, what may be constitutionally impermissible at the time one plan is adopted may be legally valid in the context of a future case. We understand, and share, the State's desire for clarity in this fundamentally important area of law. The reality, however, is that judgment in this area of law depends upon facts that are ever changing: population growth, movement, and decline. For this reason, each legislative districting plan, and the validity of a challenge to it, must be based upon the unique facts of that particular case. In other words, what may have been a permissible total number of subdivision crossings in 1992, 2002, or any of our past cases is neither controlling nor necessarily relevant to the disposition of the case *sub judice* or any future case. This, of course, does not mean that past cases are irrelevant, simply that each case must be considered within the context of its own facts.

The holistic approach is also not supported by our precedents. In the more than 40 years since the ratification of the legislative redistricting amendments in 1970 and 1972, we have never held that constitutional violations must occur on a statewide basis in order for individual petitioners to proceed upon an otherwise properly made challenge. The Special Master's analysis makes this point most clearly:

"Contrary to the State's belief, its 'holistic' argument finds no support whatever in the Court's redistricting jurispru-

dence. It is true that in the 2002 decision, the Court did comment on the number of incursions throughout the State, noting that the Governor's plan then before it had increased the number of shared Legislative Districts from 18 to 22 and concluding that there was an excessive number of political subdivision crossings that could not be justified. The Court was responding to the fact that there were 14 petitions filed in that case raising 'due regard' issues with respect to Legislative Districts in every part of the State. The Court examined each challenge individually, however, and it found violations on an individual basis.

"The gross number of incursions Statewide, standing alone, would have been meaningless had the State been able to show that each of the individual incursions was necessary to achieve population equality or to avoid a violation of the Voting Rights Act. The whole plan was struck down because that showing had not been made—the individual incursions were impermissible and were so pervasive and inter-connected that it was impossible to correct them in a surgical fashion. There is nothing in that decision, or any other, supporting the argument that one unjustified incursion should, or must, be overlooked simply because there were fewer total incursions than in the previous plan."

Lastly, what this Court may consider in testing the validity of an Enacted Plan under the Article III, § 4 legislative districting requirements is not an open question for the State to address. In *Matter of Legislative Districting of State*, 299 Md. 658, 688, 475 A.2d 428, 443 (1984), we outlined precisely what this Court would take into account in a constitutional compliance inquiry. In the context of discussing the compactness requirement, contained in Article III, § 4, we explained the nature of the redistricting process and what the Court must consider when reviewing a properly made challenge:

"Essentially, the districting process is a political exercise for determination by the legislature and not the judiciary; the function of the courts is limited to assessing *whether the principles underlying the compactness and other constitu-*

*tional requirements have been fairly considered and applied in view of all relevant considerations."*
*Id.* at 688, 475 A.2d at 443 (emphasis added).

We take from that holding that the due regard inquiry is not a count of the total number of border crossings, but an inquiry into any facts probative of constitutional compliance or conflict. The total number of crossings statewide is merely one fact, among several, that may be considered.

■ Accordingly, we hold that, because Article III, § 5 provides for any eligible citizen to have his constitutional rights vindicated in court, a single constitutionally unjustified border crossing is relevant to whether the challenged plan either complies, or conflicts, with the due regard requirement.

### C.

■ Emphasizing that this Court, in the last round of redistricting, held that a crossing between Baltimore County and Baltimore City was unnecessary, *In re Legislative Districting of State,* 370 Md. at 370, 805 A.2d at 326, and, therefore, violated the due regard clause of Article III, § 4, the petitioners argue that the present situation is not substantially different, that the 2010 Census reveals that, because Baltimore City's population did not entitle it to an additional Legislative District, the Enacted Plan also violates the due regard requirement. They submit that, with respect to the crossing between Baltimore City and Baltimore County, insofar as achieving district population equality is concerned, it benefits only Baltimore City, whose five (5) Legislative Districts could have been contained entirely within the City, as it under-populates Baltimore City districts, which permits greater representation to be given to the City. They request that this Court deem the Enacted Plan invalid under the due regard requirement and draft a new plan, redistricting Baltimore City into five legislative districts, all contained within Baltimore City, and redrawing the Baltimore County districts.

The Fourteenth Amendment to the Federal Constitution requires that legislative districts be substantially equal in

population. *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). This principle, generally referred to as "one person, one vote," applies to every level of the U.S. Government. *See DuBois v. College Park,* 293 Md. 676, 680, 447 A.2d 838, 840 (1982); *Montgomery County Council v. Garrott,* 243 Md. 634, 639, 222 A.2d 164, 165 (1966). If a county's adjusted population cannot justify an additional Legislative District, substantially equal in population to all others within the State, a political subdivision crossing will be necessary in order to achieve substantial equality in population. In this situation, the due regard requirement is subordinated to the Fourteenth Amendment requirement of substantially equal population across legislative districts. *See In re Legislative Districting of the State,* 370 Md. 312, 370, 805 A.2d 292, 326 (2002) (explaining that the due regard must yield to other constitutional requirements or federal requirements where they conflict); *In re Legislative Redistricting Cases,* 331 Md. 574, 615, 629 A.2d 646, 667 (1993) (holding same).

The fact that Baltimore City's population equaled approximately 5.1 ideal legislative districts and did not justify an additional legislative district to achieve population equality is a fact to be considered within the totality of all the facts and circumstances of the case. In that regard, it is true that population equality in Baltimore City could be achieved without creating an additional legislative district of which the City and the County were a part. On the other hand, another fact that must be considered is that Baltimore County did require the creation of an additional legislative district in order to achieve population equality. As we have seen, under the Fourteenth Amendment, the standard for substantial equality across legislative districts is a population variance no greater than 10% between the most populous district and the least populous district. *Voinovich v. Quilter,* 507 U.S. 146, 161, 113 S.Ct. 1149, 1159, 122 L.Ed.2d 500, 516 (1993); *Brown v. Thomson,* 462 U.S. 835, 842–843, 103 S.Ct. 2690, 2696, 77 L.Ed.2d 214, 222 (1983). As we have explained above, the ideal district size for the State of Maryland, based on its 2010 Census adjusted population, is 122,813 people. Therefore, the

largest constitutionally permissible variation, varying by no more than 5% from the ideal district size, and assuming no other constitutional impediment, would be 128,953 [22] people and the smallest constitutionally permissible variation, 116,-673. Accordingly, if Baltimore County were divided into six legislative districts of the largest permissible variation, more than 30,000 [23] people would be left without a district. Consequently, to satisfy equal protection principles and provide complete political representation to the citizens of Baltimore County, an additional Legislative District was needed. That could only be accomplished by establishing a multi-county district. We conclude that, because a crossing into Baltimore County from another political subdivision was constitutionally required to provide representation to all of Baltimore County's citizens, the Enacted Plan did not violate the due regard requirement.

The petitioners nevertheless contend that preference should have been given to avoiding a border crossing with a major subdivision like Baltimore City, and, thus, that the plan's drafters should have looked elsewhere to make the crossing. They assert that the reason for this particular crossing was to provide Baltimore City with a sixth legislative district, and, therefore, a sixth senator. For support, they cite a newspaper article, in which one senator stated that a sixth district was placed in Baltimore City to keep six senators in the city. On the other hand, at oral argument, the State offered that the crossing was created in order to preserve the community of interest of an African–American population that resides along the Baltimore City/Baltimore County boundary. In addition, as noted by the GRAC, reconfiguration of the Baltimore City/Baltimore County districts served to unite the Pikesville

---

**22.** $122,813 \times .05 = 6140 + 122,813 = 128,953$.

**23.** The exact figure is 34,135: $807,853 - 773,718$ $(128,953 \times 6) = 34,135$. The Special Master reached the same conclusion, even though he used the figure 122,113, as the ideal district. Using that figure, 6 districts of that size would not be sufficient to encompass the entire population of Baltimore County. Baltimore County would still have more than 38,000 people without a district.

community in one district and keep Towson together in one subdistrict.[24]

Regardless of the parties' competing explanations as to the reason that the plan's drafters included the subdivision crossing, it is clear from the facts contained in the record that the crossing between Baltimore City and Baltimore County served a constitutional purpose and, therefore, did not violate the due regard requirement. Irrespective of the argument that it may have been "better" for the plan's drafters to have made another political subdivision the subject of the border crossing, or that the plan's drafters could, and should, have avoided under-populating districts in the City and over-populating districts in the County in favor of more compact districts in Baltimore County and another County, a subdivision crossing was clearly necessary to achieve substantial population equality under the Fourteenth Amendment. Where that crossing should have been placed is not for this Court to determine. The decision as to how the districts are drawn is quintessentially a political one, which requires judicial deference to be given to the political branches. In our 2002 decision, we observed:

"To be sure, it is the responsibility of the Governor, initially, and the Legislature ultimately, if it chooses to act, to draw the legislative districts. Fulfillment of that responsibility involves the exercise of discretion in the balancing of the various constitutional requirements, as well as other considerations, to the extent they do not undermine the requirements. And because the process is partly a political one, entrusted to the political branches, political considerations and judgments may be, and often are, brought to bear as this balance is struck. Such considerations and judgments, as reflected in a districting plan that meets constitutional muster, will not be, indeed, cannot be, second guessed by the Court."

---

24. The petitioners have not attempted to show that the extension of District 44 into Baltimore County would not preserve these communities of interest.

*In re Legislative Districting of State,* 370 Md. at 369, 805 A.2d at 326.

This Court's role, therefore, is limited to determining whether the legislative apportionment plan complies with the applicable constitutional principles. It is not the Court's role to determine how a legislative apportionment plan best may embody the ideals supporting those principles. In the absence of evidence of invidious, impermissible discrimination, the choice of where the Baltimore County crossing would be located and what form that crossing would take was a political one, well within the authority of the political branches to make. The petitioners have not demonstrated "compelling evidence" that the border crossing between Baltimore City and Baltimore County violated the requirements of Article III, § 4 of the Maryland Constitution.

## IV.

The petition of Cynthia Houser, *et al.,* in Miscellaneous No. 5, challenged the Enacted Plan on behalf of 22 registered voters from 12 Legislative Districts, encompassing Frederick, Carroll, Howard, Baltimore, Prince George's, Calvert, Charles, Kent, Queen Anne's, and Caroline Counties. The petitioners argued that the Enacted Plan violates the Equal Protection Clause of the Fourteenth Amendment, and the equal protection principles to which Article 24 of the Maryland Declaration of Rights relates,[25] because the plan contains impermissible racial and political discrimination. They argue, in the alterna-

---

**25.** The potential violation of Article 24 of the Maryland Declaration of Rights is not discussed at length in this case because the petitioners do not assert any greater right under Article 24 than is accorded under both the Federal right and the population equality provision of Article III, § 4 of the Maryland Constitution. *See Maryland Aggregates Ass'n, Inc. v. State,* 337 Md. 658, 671 n. 8, 655 A.2d 886, 893 n. 8 (1995) (quoting *Murphy v. Edmonds,* 325 Md. 342, 354–355, 601 A.2d 102, 108 (1992)) ("[A]lthough the federal and state guarantees of equal protection are 'obviously independent and capable of divergent application,' they are sufficiently similar that Supreme Court decisions applying the federal clause provide persuasive authority for this Court's application of Article 24.")

tive, that the Enacted Plan violates Section 2 of the Federal Voting Rights Act of 1965 because it is the product of impermissible discrimination based on population density, region, partisanship, and race.[26] The petitioners also allege that the Enacted Plan violates the due regard and compactness requirements set forth in Article III of the Maryland Constitution. The Special Master found that each of the petitioners' claims was without merit. We have addressed the substance of the petitioners' argument pertaining to the due regard requirement in part III of this opinion. As to the petitioners' remaining challenges, we agree with the conclusions of the Special Master and, therefore, overrule the petitioners' exceptions.

## A.

The petitioners' challenge is to the alleged impermissible racial and political discrimination contained in the Enacted Plan, in violation of Article 24 of the Maryland Declaration of Rights and the Equal Protection Clause of the Fourteenth

---

**26.** Section 2 of the Voting Rights Act generally prohibits states and political subdivisions from enforcing voting practices that undermine minority voting strength. As amended, it provides in full:

"(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2), as provided in subsection (b) of this section.

"(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."

42 U.S.C. § 1973 (1982).

Amendment. In particular, the petitioners characterized the Enacted Plan's intent, in violation of both Federal and State equal protection requirements, as follows:

"(1) its intent was to punish Republicans and reward Democrats, (2) it was designed to allow areas of the State with the slowest growth to maintain their hold on power, (3) it discriminates against persons in the rural areas of the State by overpopulating districts in those areas and underpopulating districts in the urban areas, and (4) it is racially discriminatory by underpopulating nearly all African–American districts."

In support of these characterizations, their petition averred that the Enacted Plan's maximum deviation of 9.41%, having been achieved by overpopulating Republican and rural districts, while underpopulating the African American majority and more urban districts, is unnecessarily large, and thus violate the "one person, one vote" principle. More particularly, they offered examples: that 39 of the 42 districts that voted for the Republican candidate for President and Governor are overpopulated, 25 by more than 4%; that twelve of the sixteen majority African American districts are underpopulated, with the majority of them being by a deviation of more than 4%;[27] that 10 of the 15 more urban areas of Montgomery and Prince George's Counties and all six Baltimore City House districts are underpopulated, with five by more than 4%; that all seven of the faster growing, rural Southern Maryland Counties and the seven Eastern Shore districts are overpopulated by as much as 4%. In addition, the petition alleged that the Enacted Plan did not allocate to African–Americans the number of seats their population merited and that Maryland has a history of polarized voting.

With respect to their claim under Article III, § 4 of the Maryland Constitution, the petitioners alleged that "[t]he En-

---

27. In summary, as the Special Master noted, the petition averred:
"[O]f the 37 majority African–American Delegate Districts, 30 are underpopulated and, of the 30, 28 are underpopulated by more than 4% and 25 by 4.49% or more."

acted Plan contains 17 Senate Districts and 32 House Districts that are split between county lines for reasons unrelated to compliance with supervening Federal law or Maryland Constitutional requirements." The petitioners also noted the availability of alternative districting maps "that contain fewer districts that cross local government lines and were compact in form."

The petitioners' Voting Rights Act challenge specifically alleged that, considered in light of the minority population per county and its projected proportional representation,[28] the Enacted Plan manifests invidious discriminatory intent in that it fails to "afford [the petitioners] an equal opportunity to participate in the political process, and to elect political representatives of their choice, and denies [the petitioners] the right to vote in elections without distinction of race, color or previous condition of servitude in violation of 42 U.S.C. § 1973." Furthermore, they urge, by use of multi-member districts, the Enacted Plan "discriminates against African Americans because it dilutes the ability of African Americans to select their candidates of choice." The petitioners requested that the Enacted Plan be declared invalid, that this Court adopt an alternative plan—either the plan introduced in the House of Delegates by Delegates Hough and Alston or a "Coherent County Map" devised by the petitioners—and that attorneys' fees be awarded pursuant to 42 U.S.C. § 1983.

The State's answer to the petition requested dismissal of the petitioners' claims or favorable summary disposition as a matter of law. It contended, as to the Declaration of Rights argument, that Article 24 has never been construed to impose a population equality requirement for legislative redistricting. The State further contended that, in any event, maximum population variances between districts of less than 10% are a safe harbor and, therefore, do not give rise to either a Federal

---

28. The petition avers that African–Americans constitute more than 29% of the population, which would, therefore, justify 41 of the 141 Delegate seats. The Enacted Plan allocates only 37. Rather than the 13 or 14 majority Senate districts that are population justified, the petitioners point out that the Enacted Plan allocated only 12.

or State population equality claim. Moreover, the State argued, the only requirements for population equality under State law is the "substantially equal population" requirements of Article III, § 4 of the Constitution, and that the complaint failed to allege a violation of that requirement. The State also denied that the Enacted Plan was the product of, or reflected, any deliberate or intentional discrimination, and asserted that, in fact, all district lines and population deviations were produced in response to appropriate and legitimate considerations. Indeed, it posited that in order for the petitioners to allege racial gerrymandering, in the absence of any evidence of intentional discrimination, they must show that race was the sole, or at least the predominate, factor in drawing the district lines, a showing that the petitioners failed to make.

With respect to the merits of the petitioners' Voting Rights Act claim, the State maintained that the Act, by its own terms, does not guarantee that members of a protected class will be able to elect representatives in numbers equal to their proportion in the population and, indeed, that the States are not obligated by § 2 of the Act to create the maximum possible number of majority-minority districts. In order to establish a § 2 violation, the State submits, the petitioners must first satisfy three threshold factors:

> (1) the racial group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the group must be "politically cohesive"; and (3) the white majority must "vot[e] sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate."

*Thornburg v. Gingles,* 478 U.S. 30, 50–51, 106 S.Ct. 2752, 2766–67, 92 L.Ed.2d 25, 46–47 (1986). *See League of United Latin Am. Citizens v. Perry,* 548 U.S. 399, 425–26, 126 S.Ct. 2594, 2614, 165 L.Ed.2d 609, 635–36 (2006) (denominating these factors as the *"Gingles"* factors, after the case in which they were articulated). Only when all three conditions have been satisfied must the Court then consider the totality of the circumstances to determine whether members of a racial group have less opportunity than do other members of the

electorate to elect representatives of their choice. Because the petitioners failed to establish the threshold criteria, the State concluded that the petitioners lacked standing to challenge the Enacted Plan under § 2, having only a vote dilution claim with respect to the district in which they lived.

As he did with respect to the other challenges to the Enacted Plan, the Special Master did not rule on the State's dispositive motions, but instead considered the petition on its merits. With respect to the "one person, one vote" equal protection issue, agreeing with the petitioners, the Special Master concluded that, rather than a safe harbor, the " '10% rule' merely establishes a basis for assuming *prima facie* validity or invalidity and thus acts ... as a burden of proof mechanism with respect to the "one person, one vote" equal protection issue." [29] He observed that the relevant case authorities do not require the State to explain a maximum deviation under 10% unless the challenger can demonstrate that the deviation was "deliberately created in furtherance of intentional impermissible racial, political, or regional discrimination, but that, if such evidence *is* produced, the plan is not immune from judicial inquiry." (Emphasis in original).

Having examined evidence that the petitioners offered to establish the various discriminations they alleged,[30] the Special Master found nothing in the record to indicate any intent on the part of the drafters of the Enacted Plan to discriminate deliberately or that would support an inference of deliberate discrimination based on region, partisanship, or race. The Special Master found, instead, that the Enacted Plan itself increased the number of majority African–American districts,

---

**29.** Additionally, in regard to alleged equal protection violations, the Special Master found that whether Article 24 applies does not affect any ruling in this case. The petitioners did not assert any greater right under Article 24 than is accorded under both the Federal right and the population equality provision in Article III, § 4 of the Maryland Constitution.

**30.** The petitioners rely on the evidence and conclusions of their expert, M.V. Hood III, a political science associate professor at the University of Georgia.

and included, for the first time in Maryland's history, the creation of a single-member Hispanic district. Accordingly, the Special Master determined that the petitioners failed to meet their burden of showing impermissible regional, political, or racial discrimination sufficient to rebut the presumption of validity attaching to the Enacted Plan and, thus, that they are entitled to judicial relief.

Regarding § 2 of the Voting Rights Act, the Special Master agreed with the State's contention that "the mere allegation that it is possible to draw a plan that meets all redistricting requirements and has more African American districts than the Enacted Plan ... does not establish a violation of the Voting Rights Act[.]" Upon a review of the pertinent authorities and the evidence submitted by the petitioners,[31] the Special Master concluded that, to establish a violation of § 2 of the Voting Rights Act, the petitioners were required to show not only that more minority districts could have been created, but that the additional districts created would satisfy the three *Gingles* factors that the State argued in its submissions. Because the petitioners failed to make such a showing, the Special Master found no merit to their Voting Rights Act claim.

The State filed exceptions to the Special Master's opinion. Although it agrees with the Special Master that the Enacted Plan satisfies the constitutional requirements that legislative districts be substantially equal in proportion, it disagrees with the Special Master's reasoning. The State submits that it was unnecessary for the Special Master to consider "whether a legislative redistricting plan could ever be invalidated for lack of population equality where, as in this case, the plan satisfies what the Supreme Court and this Court have established as 'the 10% rule,'" believing that threshold to be a "safe haven." For this proposition, the State relies on our 1993 redistricting

---

**31.** The petitioners relied on the evidence provided by their expert Thoms B. Hofeller, who has had extensive experience in working with redistricting issues. Dr. Hofeller filed two Declarations, dated June 19, 2012, and July 13, 2012.

decision. In our 1993 opinion, after acknowledging that the maximum deviation of the Governor's plan was less than 10%, we stated: "[T]herefore, under the plain language of the Supreme Court's rulings, it satisfies the federal constitutional requirement of "one person, one vote". The population disparities in the Governor's plan are sufficiently minor so as not to require justification by the State." *Legislative Redistricting Cases*, 331 Md. 574, 594–95, 629 A.2d 646, 656 (1993). Consequently, despite our recognition in that case that,

> "[T]here may be room under *Reynolds* [*v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ] and its progeny for a plaintiff to overcome the '10% rule' if the plaintiff can present compelling evidence that the drafters of the plan ignored all the legitimate reasons for population disparities and created the deviations solely to benefit certain regions at the expense of others,"

*id.* at 597, 629 A.2d at 657 (emphasis omitted), and, in a footnote, that to do so "would be difficult," *id.* at 597 n. 17, 629 A.2d at 657 n. 17, the State argues that this Court should not address this question.

The State also relies on its conclusion that *Larios*, a federal district court decision holding unconstitutional a legislative redistricting plan with less than a 10% deviation, because it found that the plan was "not supported by legitimate [State] interests," but was "tainted by arbitrariness or discrimination," *Larios v. Cox*, 300 F.Supp.2d 1320, 1338 (N.D.Ga.2004), *aff'd*, 542 U.S. 947, 124 S.Ct. 2806, 159 L.Ed.2d 831 (2004), is nonprecedential. The State notes that *Larios* was summarily affirmed by the Supreme Court without opinion, *Cox v. Larios*, 542 U.S. 947, 124 S.Ct. 2806, 159 L.Ed.2d 831 (2004), which affirms only the judgment and not the rationale. Alternatively, the State argues that, even if it were possible for a population equality claim to overcome the State's satisfaction of the 10% rule, the petitioners have not established the deliberate and purposeful discriminatory intent that is required to invalidate a redistricting map. Accordingly, the State requests this Court to reject in their entirety the claims asserted in the Houser petition.

Unsurprisingly, the petitioners do not agree with the Special Master's opinion, and request that his recommendations be rejected in their entirety with respect to their challenge. They ask, in addition, that this Court grant them the relief they requested with respect to all claims.

The petitioners offer four exceptions to the Special Master's conclusions. First, the petitioners argue that the Special Master gave "inordinate and undue weight to the *Larios* court's quotations of Georgia legislators and map drawers in describing Georgia's redistricting plan," and, thus, in effect, erred in concluding that deliberate discriminatory intent on the part of the drafters of the Enacted Plan, necessary to the proof of an intentional discrimination claim under the Fourteenth Amendment, must be established by direct evidence. In support of this exception, the petitioners note that Supreme Court precedent, more specifically, *e.g., Roman v. Sincock,* 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620, 630 (1964), and *Brown v. Thomson,* 462 U.S. 835, 843–44, 103 S.Ct. 2690, 2696–97, 77 L.Ed.2d 214, 222–23 (1983), have permitted indirect evidence to be used to prove discrimination under the Fourteenth Amendment. The petitioners also complain that the Special Master's findings of fact contradict *Larios,* the case on which their claim largely depends.

Second, the petitioners assert that the Special Master miscategorized the nature of the petitioners' claim. As they see it, the Special Master concluded that the petitioners' claim was one of partisan gerrymandering, as to which they failed to produce sufficient supporting evidence, rather than a "one person, one vote" claim. Noting that the gravamen of the latter "is the dilution of the vote for some individuals while others are strengthened, thus devaluing one person's vote and strengthening another person's vote[,] . . . . [while a] partisan gerrymandering claim . . . seeks to prove that the dominant party has intentionally precluded the opposing party a certain number of seats," the petitioners maintain that, by relying on *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) and *Vieth v. Jubelirer,* 541 U.S. 267, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004), both partisan political gerrymandering

cases, the Special Master misapplied Supreme Court precedent and required a showing of discriminatory and partisan intent on the part of the drafters of the Enacted Plan, a showing not required to establish a "one person, one vote" violation. They argue that, under the proper Supreme Court precedent, *i.e. Roman v. Sincock*, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964), they properly alleged and proved an unconstitutional vote dilution.

As part of this exception, the petitioners lament the fact that the Special Master accepted the analysis of the State's expert, Dr. Cain, that a district's partisan composition is best determined by reference to that district's voter registrations. Acknowledging that "the Supreme Court has considered the method both Dr. Cain and the Special Master espouse—the use of voting registration to determine a district's partisan composition," they argue that the Supreme Court "has explicitly accepted voting results as the superior method in comparing a district's partisan composition," and "has explicitly rejected" that registration is superior to voting results, as the Special Master concluded.

The petitioners next exception is that the Special Master improperly imposed a heightened requirement of specificity in dismissing their due regard claim under Article III, § 4 of the Maryland Constitution. The petitioners argue that the Special Master improperly rejected the findings of Dr. Hofeller, their expert, to the effect that the Enacted Plan did not pay sufficient due regard to county boundaries, because Dr. Hofeller did not indicate the specific border crossings that were objectionable. The petitioners point out that the Special Master did not cite any case law to support the proposition that a due regard claim must plead and prove the presence of a specific impermissible border crossing. Instead, the petitioners maintain that Dr. Hofeller provided evidence demonstrating that certain counties contained impermissible border crossings, and based on that evidence, the petitioners sufficiently challenged specific county borders as unnecessary.

Finally, with respect to their Voting Rights Act claims, the petitioners except to the Special Master's conclusion that their challenge failed to satisfy the necessary threshold *Gingles* factors. They argue that the Special Master improperly focused on each of the *Gingles* factors individually in finding them insufficient to state a claim for a violation of § 2 of the Voting Rights Act. The petitioners assert that when the factors are viewed as a whole, their challenge presented a meritorious claim.

## B.

We shall not address the State's exception premised on the 10% rule purportedly establishing a "safe haven." In 1993, we did not address the merits of that issue because the petitioners did not establish the deliberate and purposeful discriminatory intent that is required to invalidate a redistricting map under such claims, explaining:

"We need not consider this question, because such is not the case here. Petitioners offer no evidence, other than the Governor's plan itself, that the plan discriminates against certain regions. While the plan does appear to favor Baltimore City, the petitioners cannot demonstrate that the disparities in the plan did not result from the GRAC's effort to accommodate legitimate policy concerns in redistricting."

*Legislative Redistricting Cases*, 331 Md. 574, 597, 629 A.2d 646, 657 (1993). That is the case here.

Turning to the petitioners' first exception, we address their argument that the Special Master erred in requiring direct evidence to establish deliberate discriminatory intent on the part of the drafters of the Enacted Plan.

In *Larios*, a three judge district court panel, following a bench trial, concluded, *inter alia:* [32]

---

**32.** The court upheld the Georgia Congressional reapportionment plan, determining it to contain "very small population deviations [that] are supported by legitimate state interests in avoiding additional precinct-splitting and in ensuring that those precincts that are divided are split

"Georgia's state legislative reapportionment plans plainly violate the "one person, one vote" principle embodied in the Equal Protection Clause because each deviates from population equality by a total of 9.98% of the ideal district population and there are no legitimate, consistently applied state policies which justify these population deviations. Instead, the plans arbitrarily and discriminatorily dilute and debase the weight of certain citizens' votes by intentionally and systematically underpopulating districts in rural south Georgia and inner-city Atlanta, correspondingly overpopulating the districts in suburban areas surrounding Atlanta, and by underpopulating the districts held by incumbent Democrats."

*Larios,* 300 F.Supp.2d at 1322. Moreover, the court stated: "The creators of the state plans did not consider such traditional redistricting criteria as district compactness, contiguity, protecting communities of interest, and keeping counties intact. . . . Rather, they had two expressly enumerated objectives: the protection of rural Georgia and inner-city Atlanta against a relative decline in their populations compared with that of the rest of the state and the protection of Democratic incumbents."

*Id.* at 1325. The evidentiary support for those conclusions was both direct, consisting of the testimony of the legislative reapportionment staff and legislators, and circumstantial, comparing the plan itself with proposed alternative plans, and it was quite extensive.

With respect to the House plan, the testimony revealed that the staff member charged with developing the plan

"took into account the political desires of various Democratic incumbents in order to achieve the ninety-one votes required to pass a plan. This was particularly difficult in south Georgia and urban Atlanta, as the districts in those areas were vastly underpopulated at the beginning of the

---

along easily recognizable boundaries wherever possible." *Larios v. Cox,* 300 F.Supp.2d 1320, 1322 (N.D.Ga.) *aff'd,* 542 U.S. 947, 124 S.Ct. 2806, 159 L.Ed.2d 831 (2004).

redistricting process and the incumbents in those districts struggled to maintain as many seats as possible. Additionally, incumbents in all areas of the state sought to limit the expansion of their districts to what was considered legally necessary, i.e., a population deviation of ± 5%. . . . At no time did the drafters of the plans nurture the ambition of drawing maps as close to equal in population as was reasonably practicable. In the end, many south Georgia incumbents who had seniority over other House members used their political influence to preserve the representation of rural interests as much as possible, resulting in greater negative population deviations in these areas and, consequently, greater positive population deviations in other areas."

*Id.* at 1326. As a result, the plan

"ha[d] a total population deviation range of 9.98% and an average deviation of 3.47%. The House districts deviate from ideal equal population by a range of + 4.99% to − 4.99%, with the largest district having 176,939 persons (in a four-member district) and the smallest district having 43,209 persons. Notably, ninety of the 180 House seats (50.00%) are in districts with population deviations greater than ± 4%. Sixty seats (33.33%) are in districts with deviations greater than ± 4.5%, and twenty seats (11.11%) are in districts with deviations greater than ± 4.9%. The most underpopulated districts are primarily Democratic-leaning, and the most overpopulated districts are primarily Republican-leaning. Moreover, most of the districts with negative deviations of 4% or greater are located either in south Georgia or within inner-city Atlanta. Plainly, redistricting plans could have been easily drawn with smaller population deviations; in fact, some such plans were offered for consideration but were summarily rejected."

*Id.* The plan split eighty counties into 266 parts, and paired forty-two incumbents, thirty-seven of whom, about half of their number, were Republicans. *Id.*

The factual situation was similar with regard to the Senate Plan. The Senator in charge of reapportionment

"focused his redistricting efforts on five primary goals: (1) drawing districts with population deviations of no greater than ± 5%; (2) ensuring that the districts did not retrogress in violation of Section 5 of the Voting Rights Act; (3) protecting or enhancing opportunities for Democrats to be elected; (4) allowing rural southern Georgia to hold on to as many seats as possible; and (5) obtaining the twenty-nine votes required to pass a plan."

*Id.* at 1327. The court described the plan that resulted from that focus:

"The resulting 2002 Senate Plan has a total population deviation of 9.98% and an average deviation of 3.78%. The Senate districts deviate from ideal equal population by a range of + 4.99% to − 4.99%, with the largest district having 153,489 persons and the smallest district having 138,894 persons. Thirty-seven of the fifty-six districts (66.07%) have population deviations greater than ± 4%. Thirty-one districts (55.36%) have deviations greater than ± 4.5%, and sixteen districts (28.57%) have deviations greater than ± 4.9%. Not surprisingly, the most underpopulated districts are primarily Democratic-leaning, and the most overpopulated districts are primarily Republican-leaning. Moreover, all of the districts with negative deviations of more than 4% are situated either in south Georgia or within inner-city Atlanta. As in the House, redistricting plans with smaller population deviations were offered for consideration, but were summarily rejected.

"The 2002 Senate Plan splits eighty-one counties into 219 parts. The plan also paired twelve incumbents, including ten of the twenty-four incumbent Republicans (42% of the caucus) but only two of the thirty-two incumbent Democrats (6% of the caucus)."

*Id.* The court also pointed to the fact that both houses of the General Assembly "used Mapitude software to draw their

redistricting plans," *id.* at 1324, which permitted them to draw plans with deviations of 0–1 person. In addition, it observed:

"The combination of technology and political data available to legislators and plan drafters also allowed for sophisticated analyses of political performance, so that maps could be drawn and then immediately analyzed politically. Thus, in drafting and considering their proposed maps, members of both houses relied on political performance projections, indicating the percentage of votes Democrats and Republicans would likely receive in future elections based upon an assessment of past election results."

*Id.*

Addressing the "one person, one vote" challenge, the court held that, in that case, the "policies the population window was used to promote . . . were not 'free from any taint of arbitrariness or discrimination.' " *Id.* at 1341 (quoting *Roman,* 377 U.S. at 710, 84 S.Ct. at 1458, 12 L.Ed.2d at 630). It explained:

"The record makes abundantly clear that the population deviations in the Georgia House and Senate were not driven by any traditional redistricting criteria such as compactness, contiguity, and preserving county lines. Instead, the defense has put forth two basic explanations for the population deviations. First, witnesses for the defendant have repeatedly asserted—and a look at the redistricting maps does nothing to dispel the notion—that a powerful cause of the deviations in both plans was the concerted effort to allow rural and inner-city Atlanta regions of the state to hold on to their legislative influence (at the expense of suburban Atlanta), even as the rate of population growth in those areas was substantially lower than that of other parts of the state. Second, the deviations were created to protect incumbents in a wholly inconsistent and discriminatory way. On this record, neither explanation can convert a baldly unconstitutional scheme into a lawful one."

*Id.* at 1341–42.

The evidence with regard to the districting plan *sub judice* and the circumstances surrounding its development are

quite different. The petitioners' case consisted of the evidence and conclusions of M.V. Hood, an associate professor of political science at the University of Georgia. Having divided the population of the Senate and Delegate Districts in the Enacted Plan by the square mileage of the District, Professor Hood concluded that the urban districts, those with the highest population density, are underpopulated, and that the rural districts, those with the lower population density, are overpopulated. From that conclusion, he draws his ultimate conclusion: "a pattern exists whereby the State's legislative plan under populates urban districts while overpopulating rural districts." More particularly, as the Special Master noted, the higher the population density, the greater the negative deviation.

To determine whether there was regional discrimination, Professor Hood divided the Delegate Districts into four geographical areas: the Western region, made up of Garrett, Allegany, Washington, Frederick and Carroll Counties; the Southern Region, consisting of Calvert, Charles and St. Mary's Counties; Baltimore City; and the eastern region, consisting of the Eastern Shore, Harford County and part of Baltimore County. Noting that all of the regions except Baltimore City were over-populated by from 1 to 4%, and that Baltimore City was underpopulated by more than 4%, he concluded that "legislative districts housed within certain regions of Maryland are intentionally over or under populated." The total number of Delegate seats accounted for by this grouping is 58. Not accounted for in this analysis, as the Special Master points out, "is the bulk of the State's population—Montgomery, Prince George's, Howard, and Anne Arundel Counties and a large part of Baltimore County, from which 83 Delegates are elected."

Besides relying on the fact that the Enacted Plan generally follows the deviation patterns established by the Court-devised 2002 plan and that the petitioners failed to present the "type" of evidence that formed the basis for the decision in *Larios,* the State presented expert evidence that challenged the validity and persuasiveness of the evidence offered by

Professor Hood. Specifically, its expert, Professor Cain, fault-ed Professor Hood's methodology as "misleadingly simplistic," in not accounting for the urban areas in the counties identified as rural. Professor Cain also maintained that the real varia-tion is between minority areas protected by the Voting Rights Act and those that are not.

To be sure, in resolving the petitioners' contention that the Enacted Plan impermissibly discriminated on the basis of population density, region, partisanship and race, the Special Master stated, addressing population density and regionalism:

"The only evidence in this record of the intent of the drafters of the Enacted Plan—the GRAC, the Governor, and, by acquiescence, the General Assembly—is in the published statements that accompanied the receipt of the GRAC's recommendation and the introduction of the two joint resolutions.[33] . . . Unlike the evidence presented in *Larios*, there is nothing in those statements that would

---

**33.** The Special Master referred to statements contained in the Maryland Department of Planning's December 16, 2011 press release, included in the State's exhibits, regarding the Governor's Redistricting Advisory Committee's (GRAC) recommendations for the Maryland Legislative Redistricting Plan. For example, Secretary Jeanne Hitchcock, chair of the Committee, stated:

"Throughout this process, the [GRAC] made an extraordinary effort to take into account the many concerns and comments from experts and citizens from across Maryland. . . . As chair of the Committee, I believe the map we are submitting to the Governor accurately reflects the population shifts and the diversity of Maryland."

Additionally, Speaker Michael E. Busch, who served on the Committee, stated:

"The Committee has worked diligently to create a fair map that incorporates the public testimony, adheres to the Voting Rights Act, adjusts for population and demographic shifts and respects county and municipal boundaries. . . . I am confident this map reflects the changing face of Maryland and ensures every Marylander will have a voice in Annapolis."

Finally, Senate President Thomas V. Mile Miller, Jr., who also served on the Committee, stated:

"This map is a fair and balanced proposal. . . . The commission faced the very difficult task of taking into account the many recommenda-tions we heard from counties, towns, communities and local elected officials and we did our very best to address their concerns while also remaining in full compliance with federal and State law."

support an inference of deliberate discrimination based on region." [34]

Addressing discrimination based on partisanship, the Special Master stated, "the petitioners presented none of the kind of evidence presented in *Larios* that might directly show an intent on the part of the Governor or the General Assembly to underpopulate or overpopulate districts for solely partisan purposes." These statements were made after the Special Master had reviewed the petitioners' contentions, and framed the issues presented and to be decided: whether, although less than 10%, "the Enacted Plan's maximum and average deviations violate the 'one person, one vote' principle because they are unnecessarily large and embody discrimination based on race, partisanship, rates of population growth, and region." The Special Master conducted an extensive analysis of the caselaw as it pertained to the question of whether the 10% threshold insulated a redistricting plan from challenge and summarized the parties' evidence and the propositions for the proof of which that evidence was offered. Moreover, the Special Master had before him the evidence that the petitioners offered to prove that the Enacted Plan was the product of racial discrimination in violation of the equal protection clause, as well as their evidence that the Plan violated Article II, § 4's compactness and due regard requirements.

With regard to the former, it is significant that, in addressing it, the Special Master acknowledged that "a showing of intentional discrimination [may be made] either directly or by necessary implication." He also found:

"Apart from the lack of evidence supporting a claim of purposeful racial discrimination, there is substantial evidence supporting the converse. It lies in the Enacted Plan itself but is summarized in the Governor's December 16,

---

**34.** It should be noted that this statement of the reference to the *Larios* evidence, while it refers to "statements," does not seem to pre-suppose that they be direct evidence, because it speaks of "statements that would support an inference of deliberate discrimination.

2011 press release ..., which, commenting on the GRAC Plan, notes:

"The GRAC map has 12 districts that are majority African American—an increase from the 10 districts that the Court of Appeals drew in 2002. This reflects the growth of the African American population in the State, and provides a much stronger voice for the African American community. These districts are 10, 22, 23, 24, 25, 26, 40, 41, 43, 44, 45, 47. In addition to the 12 majority African American districts, the map das [sic.] 4 districts (20, 21, 28, 39) that are majority minority. For the first time in Maryland's history, GRAC recommends the creation of a single-member Hispanic district in Prince George's County, District 47B, which is over 63 % Hispanic."

The evidence presented to show a lack of compactness and due regard, and the conclusions drawn from that evidence, are similarly pertinent. A deviation resulting from the State's attempt to make the districts compact and/or to pay due regard to the boundaries of political subdivisions may be justified and, therefore, defeat a challenge based on discrimination. As the Special Master pointed out, quoting *Reynolds v. Sims*, 377 U.S. 533, 577, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506, 536 (1964), the Supreme Court requires states to make "an honest and good faith effort to construct districts ... as nearly of equal population as is practicable," and that a degree of flexibility is permissible in order to permit the states to pursue other legitimate objectives, such as "maintain[ing] the integrity of various political subdivisions, insofar as possible, and provid[ing] for compact districts of contiguous territory in designing a legislative apportionment scheme," *id.* at 578, 84 S.Ct. at 1390, 12 L.Ed.2d at 537, a point also made by this Court, *see Legislative Redistricting Cases*, 331 Md. at 597 n. 17, 629 A.2d at 676 n. 17 (citing, in addition to *Reynolds, supra, Karcher v. Daggett*, 462 U.S. 725, 740, 103 S.Ct. 2653, 2663, 77 L.Ed.2d 133, 147 (1983)) ("[A] state may deviate from pure population equality among districts for numerous reasons: to make districts compact, to make districts contiguous, to respect the boundaries of political subdivisions and munici-

palities, to preserve the cores of prior districts, to avoid contests between incumbents, or to further any other rational state policy."). The point is that the deviations must be undergirded by "valid considerations," as "[i]ndiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering." *Reynolds*, 377 U.S. at 578–79, 84 S.Ct. at 1390, 12 L.Ed.2d at 537.

The Special Master characterized the petitioners' Article III, § 4 allegations as "extremely skimpy," consisting generally of the allegations that, in violation of § 4's due regard requirements, 17 Senate Districts and 32 Delegate Districts are unjustifiably split between county lines, thus rendering the created districts non-compact, and the allegation that "alternative plans are available that contain fewer shared districts and are more compact in form." The evidence offered in support of those allegations fared little better, as the Special Master described the statements of the petitioners' expert, Dr. Thomas B. Hofeller, as being "equally general." Although Dr. Hofeller defined a "necessary fragment" and, on that basis, compared the Enacted Plan with the Hough/Alston Plan and the Coherent County Plan, finding the latter two to be "much better" from the standpoint of population deviation and county crossings, he does not further explain why a crossing is considered necessary rather than unnecessary. Conceding that the alternative plans are better in some respects, the State challenges the relevancy of those facts to the constitutional inquiry and, more to the point, disputes that they undermine the Enacted Plan's legitimacy.

After review, the Special Master concluded that the petitioners had not met their burden of producing the necessary compelling evidence to require the State to justify the county crossings. He explained:

"[T]he evidence necessary to support a proper challenge requires a great deal more than is presented here. Dr. Hofeller does not identify, with any particularity, *which* fragments he considers necessary or unnecessary. In Table 1, with respect to Senate Districts, he shows two fragments

involving Baltimore County in the Enacted Plan as necessary and one as unnecessary but does not indicate which ones fall into which category. That is true as well with Carroll County. With respect to Delegate Districts, that same uncertainty is evident in Calvert, Cecil, Caroline, and Worcester ... Counties."

From the foregoing, we do not read the Special Master to be saying that direct evidence, and only direct evidence, will suffice to establish that the State, the drafters of the Enacted Plan, had a discriminatory intent in developing it. As we see it, he was comparing the quality of the evidence, both direct and circumstantial, supporting the unconstitutional determination in *Larios*, all of which went to the proof of discriminatory or arbitrary intent, with that offered in this case, and, after that comparison, he found the evidence in this case lacking. And because the evidence in *Larios* consisted of both direct and circumstantial evidence, all of which tended to prove the intent of the plan's drafters, and collectively, directly so, the reference to "the kind of evidence presented in *Larios* that might directly show" the drafters' intent, is no more than a recognition that the quality of the evidence in this case did not measure up to that in *Larios*.

In any event, the Special Master's determination that the petitioners failed to meet their burden to establish that impermissible discrimination caused the deviations in the Enacted Plan is a conclusion of law. We review conclusions of law *de novo. See generally Legislative Redistricting Cases*, 331 Md. 574, 629 A.2d 646; *In re Legislative Districting of State*, 370 Md. 312, 805 A.2d 292 (2002). Having conducted our review comparing the evidence found sufficient in *Larios* with all the evidence produced in the case *sub judice*, without distinguishing between whether it is direct or circumstantial, we arrive at the same conclusion that the Special Master reached and find that the petitioners failed to prove that the Enacted Plan was not "free from any taint of arbitrariness or discrimination." *Roman*, 377 U.S. at 710, 84 S.Ct. at 1458, 12 L.Ed.2d at 630. The petitioners' exception is overruled.

The petitioners' next exception to the Special Master's recommendations is that the Special Master mischaracterized their "one person, one vote" challenge by conflating it with a challenge based upon partisan and/or racial gerrymandering. We do not agree.

In I. *Introduction,* of their Complaint, the petitioners averred:

"2. Plaintiffs are entitled to a declaratory judgment that Maryland's plan:

"a. Violates the Fourteenth Amend of the United States Constiution—specifically the Equal Protection Clause— *Larios v. Cox,* 300 F.Supp.2d 1320 (N.D.Ga.2004)[affirmed *Cox v. Larios,* 542 U.S. 947, 124 S.Ct. 2806, 159 L.Ed.2d 831 (2004) ] and in violation of 42 U.S.C. § 1983 because of the substantial and discriminatory deviations caused by The Enacted Plan's districts which violate the "one person, one vote" principle in various ways *including* but not limited to: regional discrimination; discriminatory protection of one party's incumbents to the detriment of the minority party's incumbents; discrimination against the areas of fast population growth to the benefit of areas with slow population growth; and discrimination based on race.

"b. Violates the equal protection principles embodied in Article XXIV of the Maryland Declaration of Rights because of The Enacted Plan's patterns of discrimination on the basis of population deviations and on racial vote dilution grounds.

"c. Violates Art. III, § 4 of the Constitution of Maryland in that The Enacted Plan is not compact in form, nor does it contain substantially equal population, and nor does it give due regard to the 'natural boundaries and the boundaries of political subdivisions.'

"d. Violates § 2 of the Voting Rights Act of 1965 and the Fourteenth Amendment to the United States Constitution because *Maryland engaged in impermissible racial gerrymandering.* African Americans constitute a sufficiently

compact minority, are politically cohesive and in districts with white majorities, the white majorities are usually capable of defeating the preferred candidates of African Americans. Furthermore, under The Enacted Plan, there are 37 House districts. Given African American's proportion to the population, there should be at least 41 African American majority House districts."

(Emphasis added). Subsequently, in VI. *CLAIMS,* they further pled that the Enacted Plan "violate[d] the Equal Protection Cause of the Fourteenth Amendment to the United States Constitution as determined by the United States Supreme Court in *Larios v. Cox."* Paragraph 2 having been adopted by reference, the Complaint then stated:

"76. The Enacted Plan contravenes the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because the plan's maximum deviations violate the 'one person, one vote'. *Discrimination based on partisanship, rates of population growth—discrimination against the fast growth districts to the benefit of slow growth districts—and regional based discrimination, as well as discrimination based upon race, are the patterns that caused the deviations contained in The Enacted Plan. The districts contained in the map are therefore unconstitutional and therefore invalid."*

"77. The deviations contained in The Enacted Plan are unconstitutional because the intent of the plan—and thus what caused, in part, the deviations—was to punish Republicans and reward Democrats.

"78. The Enacted Plan uniformly protects nearly all Democrat incumbents and makes vulnerable several Republican incumbents.

"79. Districts that have voted substantially Republican are purposely and intentionally overpopulated to the detriment of voters living in those districts.

"80. The Enacted Plan was also designed to allow the areas of the state with the slowest growth to maintain their hold on power to the detriment of fast growth areas.

"81. The Enacted Plan also discriminates against those persons living in rural regions of the state to the benefit of persons living in urban areas of the state.

"82. The pattern of deviations here demonstrates that rural areas of the state are routinely and systematically overpopulated while urban areas are consistently underpopulated."

(Emphasis added).

From the foregoing, it is clear, we believe, that the Special Master did not mischaracterize or miscategorize what the petitioners pled. They pled, to be sure, a "one person, one vote" violation, committed, however, in a variety of ways and for a variety of purposes: by and for racial discrimination; by and for regional discrimination; by favoring urban areas over rural areas; and by partisan gerrymander. Having clearly pled the violation and, in the process revealed and stated its manifestation and effect, an argument to the contrary, and attempts to draw nice and fine distinctions, are not enough to make it so. The Special Master considered, and rejected, the petitioners' "one person, one vote" claim in each of its manifestations and effects, but it was only as to the political gerrymander iteration that he applied, and properly so, the Supreme Court's political gerrymander cases. In so doing, he did not err.

To establish "discrimination based on partisanship," one of the purported "patterns that caused the deviations contained in the Enacted Plan," the petitioners' expert offered population data he had examined in detail that showed how voters in the various districts had voted for President in the 2008 general election and for Governor in the 2010 general election. From this analysis, the expert concluded that "the Democratic vote is concentrated in under populated districts" and "the Republican vote is associated with districts which are above the ideal population target," and that "[e]ven without the presence of majority-black Senate districts there still remains a moderately strong, negative relationship between district population deviation and district partisanship." On the other

hand, the State's expert used population data showing party registration to conclude that "once the majority minority districts are accounted for, there is no partisan pattern in the population deviations of the districts in the Enacted Plan."

The Special Master sided with the State's expert, "suggest[ing] that voter registration is the more reliable indicator of partisanship than votes for President and Governor in two general elections." He explained:

"The latter takes no account of how people voted in the Congressional races or in the contests for State legislative or judicial offices or county or municipal legislative or executive offices in those elections; nor does it account for the various reasons why members of one party may have voted for the Presidential or Gubernatorial nominee of the other in those particular elections."

The petitioners take issue with this finding and, in fact, argue that the opposite is true, as the Supreme Court has specifically determined. For the latter proposition, they rely on language from *Easley v. Cromartie*, 532 U.S. 234, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001). Indeed, the petitioners assert that the Supreme Court has rejected evidence of party registration as an accurate gauge of a subject district's partisan composition. We are not persuaded.

In *Cromartie*, the Supreme Court reviewed a district court's finding in favor of North Carolina residents, who challenged a state congressional redistricting plan as racially gerrymandered in violation of the Equal Protection Clause. *Cromartie*, 532 U.S. at 237, 121 S.Ct. at 1455–56, 149 L.Ed.2d 430, 440. In such cases, where the Legislature is accused of improperly "us[ing] race as a criterion, in order, for example, to create a majority-minority district," the challengers "must show at a minimum that the 'legislature subordinated traditional race-neutral districting principles ... to racial considerations,'" that race was "the 'predominant factor' motivating the legislature's districting decision," *id.* at 241, 121 S.Ct. at 1458, 149 L.Ed.2d at 443 (quoting *Miller v. Johnson*, 515 U.S. 900, 916, 115 S.Ct. 2475, 2488, 132 L.Ed.2d 762, 779–80 (1995)), not

simply "a motivation for the drawing of a majority-minority district." *Bush v. Vera,* 517 U.S. 952, 959, 116 S.Ct. 1941, 1952, 135 L.Ed.2d 248, 257 (1996); *see Hunt v. Cromartie,* 526 U.S. 541, 546, 119 S.Ct. 1545, 1549, 143 L.Ed.2d 731, 738 (1999) (quoting *Shaw v. Reno,* 509 U.S. 630, 643, 113 S.Ct. 2816, 2825, 125 L.Ed.2d 511, 526 (1993), in turn quoting *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450, 465 (1977)) (stating that plaintiffs must show that a facially neutral law " 'is unexplainable on grounds other than race.' ").

The question that the Court was required to answer was whether the district court's finding that the predominant reason for the Legislature's districting decision was racial, rather than political, was adequately supported, "where the State has articulated a legitimate political explanation for its districting decision, and the voting population is one in which race and political affiliation are highly correlated." *Cromartie,* 532 U.S. at 242, 121 S.Ct. at 1458, 149 L.Ed.2d at 445.[35]

The Court considered whether party registration data provided that support, and concluded that it did not. *Id.* at 244–245, 121 S.Ct. at 1460, 149 L.Ed.2d at 445–46. Regarding the use of party registration data, the Court explained:

---

**35.** It is significant that the correlation between race and political affiliation was evidence-based. An analysis of the protection afforded by the Equal Protection Clause against impermissible racial discrimination in legislative districting is provided in *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). The Supreme Court explained there that the central purpose of the Equal Protection Clause is to prevent the States from purposely discriminating between individuals on the basis of race. *Id.* at 642, 113 S.Ct. at 2824, 125 L.Ed.2d at 525. No inquiry into legislative purpose is necessary when the racial classification appears on the face of the statute, or where a statute, although facially race neutral, reasonably cannot be understood as anything other than an effort to separate voters into different districts on the basis of race. *Id.* at 649, 113 S.Ct. at 2828, 125 L.Ed.2d at 530. In effect, a challenge under the Equal Protection Clause requires, as the Special Master correctly concluded, a showing of intentional discrimination, either intentional discrimination or discrimination that in effect is tantamount to intentional discrimination. *See id.* at 649, 113 S.Ct. at 2828, 125 L.Ed.2d at 530.

"In part this is because white voters registered as Democrats 'cross-over' to vote for a Republican candidate more often than do African–Americans, who register and vote Democratic between 95% and 97% of the time.... A legislature trying to secure a safe Democratic seat is interested in Democratic voting behavior. Hence, a legislature may, by placing reliable Democratic precincts within a district without regard to race, end up with a district containing more heavily African–American precincts, but the reasons would be political rather than racial."

*Id.* at 245, 121 S.Ct. at 1460, 149 L.Ed.2d at 445–46. It also was of significance to the Court that "the primary evidence upon which the District Court relied for its 'race, not politics,' conclusion [was] evidence of voting registration, not voting behavior; and that is precisely the kind of evidence that we said was inadequate the last time this case was before us." *Id.* at 244, 121 S.Ct. at 1459, 149 L.Ed.2d at 444. It was for this reason that the Supreme Court rejected the district court's reliance on registration data as sufficient to satisfy the demanding burden of proof to show that a facially neutral law is unexplainable on grounds other than race, *id.* at 241–42, 121 S.Ct. at 1458, 149 L.Ed.2d at 443, and, instead, held that actual voting results data would more accurately determine whether race and political affiliation are highly coordinated. *Id.* at 245, 121 S.Ct. at 1460, 149 L.Ed.2d at 445.

The petitioners' reliance on *Cromartie* is to no avail. It is true, as the petitioners argue, that the Supreme Court, in that case, rejected evidence of party registration as an accurate gauge of a subject district's partisan composition, but it did so in a specific and discrete situation, in a racial gerrymander case, where proof of the Legislature's racial intent, is not only crucial, but is subject to "a demanding" burden of proof, which the proponents of the evidence must meet. *Cromartie*, 532 U.S. at 241, 121 S.Ct. at 1458, 149 L.Ed.2d at 443 (citing *Miller v. Johnson*, 515 U.S. 900, 928, 115 S.Ct. 2475, 2497, 132 L.Ed.2d 762, 790–91 (1995) (O'CONNOR, J., concurring)). There is nothing in that case, or in any other that we could find, that indicates that the Court would reach the same

conclusion when the case is simply a political gerrymander case, where the issue is whether the Legislature's motivation was purely political. In that situation, the Special Master's suggestion, that voter registration data is more reliable, may well be correct. The petitioners' exception on these grounds is overruled.

As indicated, finding the petition "extremely skimpy" and the evidence in support of its allegations to be "equally general," the Special Master concluded that the petitioners did not support their challenge based on the compactness and due regard requirements of Article III, § 4 with compelling evidence. In particular, he referred to the petitioners' expert's lack of "particularity" in identifying necessary and unnecessary boundary crossings. Disagreeing with that assessment of their petition, the evidence they presented in support of it and the conclusion the Special Master drew, the petitioners filed an exception in which they charged that the Special Master, without "cit[ing] a case to support the proposition that a petitioner must plead and prove the presence of a specific illicit border crossing," "imposed a heightened requirement of specificity in evaluating whether Maryland violated the due regard section of Article 3, § 4" and affirmatively asserted that their expert's report was "sufficiently specific" as to the districts in which the shared districts were unnecessary. They also maintain that "the evidence Dr. Hofeller adduced is consistent with the goals of the due regard provision, namely to protect and uphold Maryland's deference to its county system of government. *In the Matter of Legislative Districting of the State,* 370 Md. at 357–58 [ (805 A.2d at 319 ]."

In support of their exceptions, the petitioners reiterated the evidence presented at the hearing before the Special Master, challenged the statements, assumptions and conclusions of the State's expert witness, and frequently contrasted the Enacted Plan with the alternative plans, the Coherent County Plan and the Hough/Alston Plan, which they favored over it, as proof of the validity of their challenges. For example, the petitioners argue:

"Maryland contends that its border crossings in Baltimore and Carroll County in the Enacted Plan were caused by population deficiencies. (Cain Decl. ¶ 21, June 5, 2012). This ostensible justification cannot be true. The Coherent Counties Plan demonstrates that no county is required to be split in the Senate plan, and, still, the population deviation remains lower than the Enacted Plan (Hofeller Decl. ¶ 21, July 13, 2012). The Baltimore, Carroll County and Prince George's County splits were not required to maintain compactness because the Coherent County Plan has better compactness scores. Compliance with the Voting Rights Act cannot be the cause of Maryland's split counties because the Coherent Counties Plan contains more majority-minority districts. (Hofeller Decl. ¶¶ 18–19, July 13, 2012). No federal requirement or Maryland constitutional requirement is the reason behind these county splits.

"Dr. Hofeller's report demonstrated that the Enacted Plan contained unnecessary splits in the southern portion of the state in addition to the county splits in Baltimore. (Hofeller Decl. Table 1, July 13, 2012). In the counties of Prince George's, Anne Arundel, Calvert, St. Mary's, and Charles Counties, the Enacted Plan contains two Senate splits and four House splits more than the [Coherent County Plan]. (Hofeller Decl. Table 1, July 13, 2012)."

The petitioners did not further explain the basis for the conclusion drawn by their expert with regard to the necessity for the boundary crossings he found to be appropriate and the lack of necessity for those he deemed not to be.

 As was the case with the petitioners' first exception, the conclusion that the petitioners failed to meet their burden of proof with respect to the due regard and compactness requirements is a question of law, which we review *de novo.* Having so reviewed the evidence that the petitioners presented, we reach the same conclusion reached by the Special Master. It should be said, in addition, that we do not believe that requiring an expert to explain and/or provide support for his or her conclusions is the imposition of a "height[ened] requirement of specificity." It is well settled in this State that

an expert's opinion is only as good as the basis offered to support it. *See Exxon Mobil Corp. v. Albright*, 433 Md. 303, 418, 71 A.3d 30, 100 (2013) (citing *Giant Food, Inc. v. Booker*, 152 Md.App. 166, 188, 831 A.2d 481, 494 (2003), *cert. denied*, 837 A.2d 926, 378 Md. 614 (2003), in turn quoting *Surkovich v. Doub*, 258 Md. 263, 272, 265 A.2d 447, 451 (1970) ("[A]n expert's opinion must be grounded in sufficient facts, such that it constitutes more than mere speculation or conjecture[.]"); *Beatty v. Trailmaster Prod., Inc.*, 330 Md. 726, 741, 625 A.2d 1005 (1993) (quoting *State Dep't of Health v. Walker*, 238 Md. 512, 520, 209 A.2d 555 (1965)) ("[N]o matter how highly qualified the expert may be in his field, his opinion has no probative force unless a sufficient factual basis to support a rational conclusion is shown."). *See also Giant Food, Inc. v. Booker*, 152 Md.App. 166, 182–83, 831 A.2d 481, 490 (2003), cert. denied, 837 A.2d 926, 378 Md. 614 (2003) (quoting *Uhlik v. Kopec*, 20 Md.App. 216, 223, 314 A.2d 732, 737 (1974), *cert. denied*, 271 Md. 739 (1974)) ("An expert's opinion testimony must be based on a adequate factual basis so that it does not amount to 'conjecture, speculation, or incompetent evidence.' ")).

 The petitioners' final exception is to the Special Master's conclusion that they did not satisfy the so called *Gingles* factors test under § 2 of the Voting Rights Act. They argue that the Special Master was wrong in so concluding, because the totality of the circumstances shows the need for majority-minority districts in order for African–American voters to elect candidates of their choice. Having pled that African–Americans constitute 29.3% of the State's population, and applying proportionality, that means that African–Americans should have at least 41 of the 141 seats in the House of Delegates and 13 or 14 Senate seats, and the Enacted Plan allocates only 37 seats to majority African–American Delegate districts and only 12 seats to majority African–American Senate Districts, the petitioners argue that the Enacted Plan does not afford African–American voters an equal opportunity to participate in the political process and elect representatives of their choice. The petitioners ask that this Court adopt

either the alternative plan introduced into the House of Delegates by Delegates Hough and Alston or the Coherent County Map devised by the petitioners—both of which, they assert, demonstrate that drawing majority-minority districts is possible while still adhering to other traditional redistricting principles.[36]

The State asserts, in response, that the Voting Rights Act does not confer a right to have members of a protected class elected in numbers equal to their proportion of the population. Section 2 of the Act, it submits, does not obligate the States to create the maximum possible number of majority-minority districts.[37] Moreover, the State argues, the petitioners have failed to establish the threshold criteria required by the Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) to establish a Voting Rights Act violation.

Congress enacted the Voting Rights Act of 1965 "[i]n an effort to eradicate persistent assaults on the ability of minorities to vote...." *Legislative Redistricting Cases,* 331 Md. 574, 602, 629 A.2d 646, 660 (1993). The Act was given two main provisions. Section 2 proscribes states and their subdivisions from imposing any qualification, prerequisite, standard, practice, or procedure which undermines minority voting strength. *42 U.S.C.A. § 1973.* Section 5 prevented certain states and subdivisions from changing election laws with the purpose or effect of detrimentally affecting minority voting power. *42 U.S.C.A. § 1973c.*[38] In addressing the petitioners' challenge,

**36.** "In majority-minority districts, a minority group composes a numerical, working majority of the voting-age population. Under present doctrine, § 2 can require the creation of these districts." *Bartlett v. Strickland,* 556 U.S. 1, 13, 129 S.Ct. 1231, 1242, 173 L.Ed.2d 173, 183 (2009).

**37.** "States retain broad discretion in drawing districts to comply with the mandate of § 2." *Shaw v. Hunt,* 517 U.S. 899, 917 n. 9, 116 S.Ct. 1894, 1906 n. 9, 135 L.Ed.2d 207, 226 n. 9 (1996).

**38.** Section 5 of the Voting Rights Act of 1965, in any event, was struck down in *Shelby County, Ala. v. Holder,* —— U.S. ——, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013).

however, our inquiry here only concerns § 2 of the Voting Rights Act of 1965, as amended in 1982.[39]

Section 2 prohibits any practice which results in a denial or abridgment of minority voting rights. A minority need only show, in the totality of the circumstances, that it has less opportunity for electoral participation and success in order to establish a Voting Rights Act violation. *Legislative Redistricting Cases,* 331 Md. 574, 604, 629 A.2d 646, 661 (1993). We have elaborated:

"A violation of § 2 exists if, 'based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protection by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.' § 1973(b). It is not necessary for a plaintiff to demonstrate intentional discrimination in order to prove a violation of the VRA."

---

39. Section 2 of the Voting Rights Act of 1965, as amended in 1982, provides:

"(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

"(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."

*42 U.S.C.A. § 1973* (emphasis in original).

*In re Legislative Districting of State,* 370 Md. 312, 390, 805 A.2d 292, 338 (2002).

In *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the Supreme Court provided guidance for proving a violation of the amended § 2 of the Voting Rights Act that remains crucial for evaluating challenges to a districting plan under § 2. *See also League of United Latin American Citizens v. Perry,* 548 U.S. 399, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006); *Bartlett v. Strickland,* 556 U.S. 1, 129 S.Ct. 1231, 173 L.Ed.2d 173 (2009). There, the Court opined that the essential question in Voting Rights Act actions "is whether 'as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to practice in the political process and to elect candidates of their choice.'" *Gingles,* 478 U.S. at 44, 106 S.Ct. at 2763, 92 L.Ed.2d at 43 (quoting the Senate Judiciary Committee majority Report accompanying the § 2 amendments (S.Rep. No. 97–417, at 28 (1982))).[40] It instructed courts to look to objective factors to answer this question. *Id.*

The Court also recognized that multimember districts and at-large election schemes are not *per se* violations of minority voters' rights. *Id.,* at 48, 106 S.Ct. at 2765, 92 L.Ed.2d at 45. Multimember districts generally will not impair minority voters' ability to elect representatives of their choice, except when there exist three necessary preconditions:

> "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. . . . Second, the minority group must be able to show that it is politically cohesive. . . . Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."

---

**40.** The Supreme Court has referred to the Senate Report on the 1982 amendments to the Voting Rights Act to identify factors typically relevant to a § 2 claim.

*Id.,* at 50–51, 106 S.Ct. at 2766–67, 92 L.Ed.2d at 46–47 (internal citations and footnotes omitted).

The three aforementioned *Gingles* preconditions serve as a framework for analyzing challenges to a multimember districting plan under § 2 of the Voting Rights Act. Therefore, the claimant(s), as an initial matter, must first satisfy these three conditions as they apply to individual districts. "If all three *Gingles* requirements are established, the statutory text directs us to consider the 'totality of circumstances' to determine whether members of a racial group have less opportunity than do other members of the electorate." *League of United Latin Am. Citizens v. Perry,* 548 U.S. 399, 425–26, 126 S.Ct. 2594, 2614, 165 L.Ed.2d 609, 636 (2006) (citing *Johnson v. De Grandy,* 512 U.S. 997, 1011, 114 S.Ct. 2647, 2657, 129 L.Ed.2d 775, 790–91 (1994). *See Abrams v. Johnson,* 521 U.S. 74, 91, 117 S.Ct. 1925, 1936, 138 L.Ed.2d 285, 303 (1997).) In *Gingles,* the Court stated: "These circumstances are necessary preconditions for multimember districts to operate to impair minority voters' ability to elect representatives of their choice . . ." *Gingles,* 478 U.S. at 50, 106 S.Ct. at 2766, 92 L.Ed.2d at 46. Findings as to these preconditions are "upheld unless clearly erroneous." *League of United Latin Am. Citizens,* 548 U.S. at 427, 126 S.Ct. at 2614, 165 L.Ed.2d at 636–37. *See Gingles,* 478 U.S. at 78–79, 106 S.Ct. at 2780–81, 92 L.Ed.2d at 64.

 Relevant objective factors, which may be Statewide or regional in nature, in a "totality of the circumstances" determination include, but are not limited to, the following:

"1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

"2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

"3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting prac-

tices or procedures that may enhance the opportunity for discrimination against the minority group;

"4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

"5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

"6. whether political campaigns have been characterized by overt or subtle racial appeals;

"7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

"Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

"whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

"whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."

*Gingles,* 478 U.S. at 36–37, 106 S.Ct. at 2759, 92 L.Ed.2d at 46 (quoting S.Rep. No. 97–417, at 28–29 (1982)). *See League of United Latin American Citizens v. Perry,* 548 U.S. 399, 426, 126 S.Ct. 2594, 2614, 165 L.Ed.2d 609, 636 (2006).

The following were pled as facts relevant to the petitioners' Voting Rights Act violation claim, either as a threshold matter, or to the "totality of the circumstances" review:

"64. When looking at districts with African American majorities, Maryland's pattern of intentional manipulation of deviations is repeated. Of these sixteen districts, twelve are underpopulated, ten have population deviations that ex-

ceed –4%, and eleven have population deviations that exceed –3%.

\* \* \*

"70. Maryland discriminated against African Americans by using multimember districts to dilute African American ability to elect candidates of their choice.

"71. African Americans can constitute a compact minority group in a significantly larger number of districts than under the current map.

"72. Given African American population in Maryland, there should be more African American representatives in the Maryland General Assembly.

"73. Maryland has a history of racially polarized voting. One need only look to the Mfume–Cardin Democrat Senate Primary race in 2006 or the Gansler–Simms Democrat primary for Maryland Attorney General in 2006 to see racially polarized voting.

"74. Maryland['s] history [of] race relations and socioeconomic history, combined with the record of minority success in elections demonstrates that the totality of the circumstances test has been met."

In support of those allegations, the petitioners offered the Declaration of their expert, Professor Hood. In that Declaration, he applied a statistical analysis, referred to as "ecological inference estimates,"[41] to Democratic Senate and Delegate primary elections in four districts, Legislative Districts 23, 27, 28 and 41, in the State, over several election cycles, and the 2010 Democratic primary for Senate and Attorney General. Based on this analysis, Professor Hood inferred that in four of

----

**41.** The Special Master explained that Professor Hood defined an "ecological inference estimate" as a statistical technique that "allows researchers to make inferences about individual-level behavior which is not directly observable, from observable aggregate-level measures." Professor Hood referenced works regarding ecological inference estimates, but presented no data regarding the acceptability of this technique among other statisticians or political scientists and merely assumed its reliability. Hood Declaration at 13, *Cynthia Houser, et al. v. Martin O'Malley,* n. 11.

the six local races the candidate receiving the largest share of the African–American vote lost. From that inference, he concluded that "legislative districts . . . that do not contain a sufficient number of black voters can see the preferred choice of the African–American community defeated by a polarized bloc of Anglo [non-Hispanic white] voters."

The State denied that the petitioners' evidence established a violation of the Voting Rights Act, noting that a showing only that more single-member minority districts could be created does not establish a Voting Rights Act violation and that the *Gingles* factors are threshold factors, which focus on the individual districts, so that state-wide voting patterns are irrelevant.[42] The State also acknowledged that it may have been possible to devise a plan that created more single-member majority African–American districts, but that it was not required to do so in the absence of proof of a Voting Rights Act violation.

The Special Master rejected the petitioners' Voting Rights Act challenge, concluding that they did not pass the *Gingles* threshold. He explained:

"Except for the last two examples given by Professor Hood, in which a significant part of the estimated black vote went for the white candidate(s),[43] the data he presented, assuming the validity of the 'ecological inference estimate' approach, does provide evidence of racially polarized voting in one Legislative District in Baltimore City and three Legislative Districts in Prince George's County. All but one of the examples, however, (District 2[8] ) involved district-wide

---

**42.** The State relies on the opinion of its expert, Bruce E. Cain, a professor of political science at the University of California Berkeley, to criticize the petitioners' data and analysis on a number of grounds: that the petitioners' data is incomplete and skewed and that "[h]ad [Professor Hood] taken a broader sample, he would have discovered that Maryland's recent record of non-Hispanic Anglo voting polarization is much more mixed and varies with the specific candidates running for office."

**43.** One of the examples is District 28, to which we refer later.

Senate races in which the issue of using multi-member districts to dilute the African American vote is not raised."

The petitioners' exception is that "the Special Master improperly concluded that Petitioners did not satisfy the *Gingles* factors." They insist, to the contrary, that they have satisfied those factors by demonstrating that the districts noted in their pleadings "demonstrate a particularly high instance of racial block voting on the part of non-Hispanic whites" and that "[t]hese abnormally high levels of racial block voting on the part of non-Hispanic whites effectively blocks African American[s] from electing their candidates of choice." Emphasizing and maintaining that they pled and proved the *Gingles* factors, the petitioners complain:

"Rather than focus on the *Gingles* factors pled, the Defendant [and presumably the Special Master] isolates each claim and attacks them individually as insufficient to state a claim for a violation under the Voting Rights Act. When viewed as a whole, the Petitioners have stated a sufficient claim."

We shall overrule this exception. Despite the petitioners' statement of the *Gingles* test in their exceptions, they, in effect, believe, and therefore argue, that the establishment that race and racial polarization contributed to the outcome of previous elections by a totality of the circumstances is sufficient to establish a Voting Rights Act violation. They are wrong, as the Special Master found. Assuming the validity of the ecological inference estimate approach, the data presented by the petitioners does provide evidence of racially polarized voting in Districts 41, 27, and 23.[44] Moreover, the data presented for all of the multi-member districts, except District 23, involved district-wide Senate races. As a result, the data does not demonstrate that any politically cohesive minority group within a single-member district is sufficiently large and geographically compact to constitute a majority group in that

---

44. The petitioners' data from races in Districts 23 and 28 showed a significant part of the estimated African–American vote went for the non-Hispanic white candidate.

district. "If [the group] is not, as would be the case in a substantially integrated district, the multimember form of the district cannot be responsible for minority voters' inability to elect its candidates." *Gingles*, 478 U.S. at 50, 106 S.Ct. at 2766, 92 L.Ed.2d at 46 (emphasis omitted) (citing *Rogers v. Lodge*, 458 U.S. 613, 616, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012, 1017 (1982)). As this Court explained in *Legislative Redistricting Cases* in response to similar allegations and evidence:

"However, as *Gingles* makes clear, [Petitioner] must do more than simply allege that a minority district could have been created to establish a § 2 violation. [Petitioner] must show that the 32.6% black population in district 47A is sufficiently compact to form a majority in a single-member district, that it is politically cohesive, and that the white voters in district 47A vote sufficiently as a bloc to enable them to defeat the minority's preferred candidate. [Petitioner] makes none of these showings, either with respect to district 47A or any other potential single-member districts in the City. The Voting Rights Act simply does not require a state to create every conceivable minority district. *Turner v. State of Ark.*, 784 F.Supp. 553, 573 (E.D.Ark.1991), *aff'd*, 504 U.S. 952, 112 S.Ct. 2296, 119 L.Ed.2d 220 (1992) (§ 2 is not an affirmative action statute, and a state need not enact a districting plan that maximizes black political power or influence); *Burton* [*on Behalf of Republican Party v. Sheheen*], [793 F.Supp. 1329], 1362 [ (1992) ] ("[D]istrict by district enhancement [of majority black districts] is not constitutionally mandated.")."

331 Md. 574, 608–09, 629 A.2d 646, 663 (1993).

Similarly, here the petitioners must show that the African–American voting age population in an individual district is sufficiently compact to form a majority in a single member district. As we have seen, the only non-Senate election involving a multimember district that was offered as evidence that multi-member districts are used to dilute the African Ameri-

can vote, was the election for delegate in District 28. In that election, the three white candidates defeated the African American candidate in a district with a 39.1% black voting age population, getting, between them, 67.1% of the black vote. The petitioners have not made such a showing and thus fail to satisfy the first of the *Gingles* requirements.[45]

The petitioners also rely on a study conducted by the University of Maryland to illustrate the State's use of multi-member districts as a device to prevent African–Americans from successfully electing their candidate of choice.[46] The study found that African–Americans are not proportionally represented in the Maryland Legislature. African–Americans comprise 29% of the Maryland population, but only 21% of the General Assembly. Proportionality, however, is only an indicator of a potential Voting Rights Act violation:

> "One of the primary considerations under § 2 of the VRA is proportionality, or lack thereof, between the number of minority-controlled districts and the minority's share of the state's relevant population. The Supreme Court has indicated that, while rough proportionality does not automatically protect a state from liability under § 2, nor does § 2 require a state to maximize the possible number of majority-minority districts, proportionality is a strong 'indication that minority voters have an equal opportunity, in spite of racial polarization, to participate in the political process and to elect representatives of their choice.' "

---

**45.** "[T]he first *Gingles* requirement is 'needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district.' Without such a showing, 'there neither has been a wrong nor can be a remedy.' " *Bartlett v. Strickland,* 556 U.S. 1, 15, 129 S.Ct. 1231, 1243–44, 173 L.Ed.2d 173, 185 (2009) (citations omitted) (quoting *Growe v. Emison,* 507 U.S. 25, 40–41, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388, 404 (1993)).

**46.** *See* Christine Sanquist Patricia Mullaney, and Paul S. Herrnson U. of Md. Ctr. for Am. Politics And Citizenship, *Demographic Representation in Maryland State Government: Candidates And Elected Officials in 2010,* 9 (Dec. 17, 2010).

*In re Legislative Districting of State,* 370 Md. 312, 393–94, 805 A.2d 292, 340–41 (2002) (internal citations omitted) (quoting *Johnson v. De Grandy,* 512 U.S. 997, 1020, 114 S.Ct. 2647, 2661, 129 L.Ed.2d 775 (1994), in turn quoting § 2 of the VRA).[47]

The State is correct in its analysis that the *Gingles* factors focus on individual districts, and therefore statewide voting patterns are not determinative with respect to the *Gingles* factors, but are relevant only to an examination of the totality of circumstances once the petitioners satisfy those threshold factors. Even if the petitioners were to satisfy the *Gingles* factors, however, they have only presented evidence regarding Legislative Districts 23 and 27 in Prince George's County, District 28 in Charles County, and District 41 in Baltimore City. The petitioners failed to present any evidence indicating that any other district or sub-district was similarly situated.[48]

---

47. The Supreme Court also explained in *Johnson v. De Grandy* that "the ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." 512 U.S. 997, 1014 n. 11, 114 S.Ct. 2647, 2658 n. 11, 129 L.Ed.2d 775, 792 n. 11 (1994).

48. The petitioners ask for a declaratory judgment that the Enacted Plan, in its entirety, is in violation of § 2. The petitioners, however, have not indicated how the alleged violation, with respect to any particular district, should be corrected. The petitioners have asked this Court to adopt alternative redistricting plans, which they claim would reduce population disparities. Nonetheless, the petitioners have not alleged how these alternative plans would resolve any Voting Rights Act violations by creating new or different single-member Delegate Districts.